UNITED STATES of America, Appellee,

v.

Alan C. OTTENS, Defendant, Appellant.

No. 95–1899.

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1996.

Decided Jan. 30, 1996.

Peter B. Krupp, Federal Defender Office, Boston, MA, for appellant.

Anita S. Lichtblau, Trial Attorney, United States Dep't of Justice, Boston, MA, with whom Donald K. Stern, United States Attorney, Ellen R. Meltzer, Special Counsel, McLean, VA, and Paul M. Glickman, Trial At-

torney, Newton, MA, were on brief, for the United States.

Before SELYA, BOUDIN and LYNCH, Circuit Judges.

SELYA, Circuit Judge.

Defendant-appellant Alan C. Ottens pleaded guilty to a golconda of charges involving bank fraud, 18 U.S.C. § 1344, bank bribery, 18 U.S.C. § 215, and conspiracy to commit such felonies, 18 U.S.C. § 371. Seventeen months after accepting appellant's guilty plea, the district court denied his request for a ninth continuance and imposed sentence. Ottens appeals. We affirm.

## I.

### The Background

Because the facts underlying the offenses of conviction are of only peripheral interest in connection with this appeal, we sketch the background.

Ottens rode the crest of a wave of real estate development that surged through New England in the 1980s. Unable to match his resources to his ambitions, he caught the nearest way. During the period from 1986 to 1988, he delivered in excess of $250,000 in bribes (including cash, jewelry, and a new house) to Jeffrey Diminico, a loan officer of the Lawrence Savings Bank (the Bank). In return, the Bank disbursed extravagant loans to Ottens and entities that he controlled. This skulduggery did not mark the full extent of Ottens' repertoire; he also bribed other bankers and, on the side, brokered questionable loans for third parties through Diminico (exacting substantial kickbacks from benefitted borrowers).

We need describe only two of the renegade transactions. The first venture had three phases (each facilitated by bribery). Initially, Ottens euchred a $400,000 loan from the

Bank to purchase a parcel of real estate in Marlboro, Massachusetts. Next, he borrowed $1,175,000 from the Bank to refinance the original loan, acquire adjacent property, and construct a building on the site. Finally, when the loan went into default, he recruited a purchaser for the project and arranged for the Bank to furnish financing (even though he knew the purchaser could not service the debt). The Bank ultimately foreclosed, sustaining a loss of approximately $2,750,000.[1]

The second transaction involved real estate in North Andover, Massachusetts. Diminico assisted Ottens in procuring a commitment from the Bank to supply $1,400,000 for acquisition of the tract. After closing on the land for considerably less than the face amount of the loan, Ottens wangled an additional $6,000,000 in construction financing for the ostensible purpose of building a new headquarters for the Bank.[2] When Ottens defaulted, the Bank absorbed a loss of roughly $4,500,000.

## II.

### The Proceedings Below

In early 1994, Ottens waived indictment and, pursuant to a written agreement with the United States, pleaded guilty to a nine-count information. The court originally set the disposition hearing for March 29, 1994. Ottens cooperated with the government and remained free on his own recognizance. At his request, the court postponed sentencing four times during the next fourteen months.

In the spring of 1995, Ottens' lawyer moved to withdraw. The court acquiesced and deferred sentencing until May 26, 1995. On May 15, the court notified the Federal Defender Office that it had been designated to represent Ottens. A member of that office entered an appearance. On May 25 the newly appointed attorney moved for a sixth continuance, advising the court that he need-

---

1. In contrast, Ottens profited at every stage. He siphoned off $100,000 from the initial loan proceeds and used it for purposes unrelated to site acquisition. He later diverted over $500,000 of the construction loan proceeds. When he eventually arranged the hapless extension of credit for the new borrower, he managed to extract some $400,000 for himself.

2. In a characteristic maneuver, Ottens diverted some $2,000,000 of the loan proceeds. He used the plundered funds for a wide variety of unauthorized expenditures (including the installation of a swimming pool at the residence of the Bank's president).

ed the extra time both to prepare for sentencing and to sort out a possible conflict of interest. The court granted a reprieve until June 13. On June 7, having satisfied himself vis-a-vis the suspected conflict, counsel sought a further thirty-day postponement in order to do more spade work. The district court, expressing grave concern over the repeated delays, continued the disposition hearing until June 20. On that date, counsel protested that he had been unable to master the case's complexities and beseeched the court to put off the hearing yet again. Although noting rather pointedly that counsel had already represented the defendant for thirty-five days, the court yielded to the importuning and rescheduled the hearing for June 30.

On June 28, defense counsel submitted a fifteen-page sentencing memorandum (supported by a 400–page appendix) arguing that multiple causes beyond Ottens' chicanery triggered the Bank's losses, and that, in all events, the alleged losses were overstated. The attorney then asked for another thirty days to assemble additional materials in support of these contentions. The next day, notwithstanding his claim of insufficient preparation time, the attorney submitted a supplementary memorandum addressing multiple loss causation. On June 30, the court denied the motion for a ninth continuance. Judge Gorton observed that sentencing had already been delayed for nearly seventeen months, that successor counsel had been on the case for almost six full weeks, and that the filed memoranda clearly illuminated the defense's points.

Little daunted, Ottens' lawyer renewed his motion for a continuance, this time alleging that the government had not seasonably disclosed how it calculated the loss that it attributed to the offense conduct. The district court summarily denied this motion, proceeded with the disposition hearing, established a guideline sentencing range (GSR) of 37–46

months,[3] rejected Ottens' entreaty for a downward departure, and imposed *inter alia* a mid-range prison sentence (forty-two months). This appeal ensued.

### III.

#### *The Further Continuance*

Ottens contends that the district court's refusal to grant a ninth continuance following his guilty plea left his lawyer with insufficient time to prepare for sentencing. Our review of the record confirms that the court acted well within its discretion in rejecting this supplication.

 We need not tarry. Time is a lawyer's stock in trade, and a thorough lawyer almost always can find ways in which to put additional time to productive use. The test, however, is not counsel's subjective satisfaction with his level of preparedness. It is the province of the district court to manage its docket, *see United States v. Devin*, 918 F.2d 280, 291 (1st Cir.1990), and, within that province, to decide what constitutes a reasonable period of time for preparation. *See United States v. Saccoccia*, 58 F.3d 754, 770 (1st Cir.1995). We will meddle in the trial court's determination only if an abuse of discretion looms, that is, if the allegedly aggrieved party can show that the court "indulged a serious error of law or suffered a meaningful lapse of judgment, resulting in substantial prejudice to the movant." *Id.*

When confronted by a motion for a continuance, the trial court may have a variety of concerns. Some may relate to the nature and stage of the proceeding; a mid-trial continuance, for example, evokes different concerns than rearranging a pretrial hearing. *See Devin*, 918 F.2d at 291. Obviously, the reasons that the movant contemporaneously adduces in support of the request are important. *See United States v. Lussier*, 929 F.2d 25, 28 (1st Cir.1991). Then, too, the court is likely to take into account prior continuances

---

**3.** Applying the November 1987 version of the guidelines, the court started with a base offense level of six, *see* U.S.S.G. § 2F1.1(a), added eleven levels because the loss exceeded $5,000,000, *see* U.S.S.G. § 2F1.1(b)(1)(L), added four levels due to Ottens' role in the offense, *see* U.S.S.G. § 3B1.1(a), added two levels because the offense

conduct required more than minimal planning, *see* U.S.S.G. § 2F1.1(b)(2), and subtracted two levels for acceptance of responsibility, *see* U.S.S.G. § 3E1.1(a). The adjusted offense level—21—combined with the lack of any prior criminal record to produce the GSR. *See* U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

and such other factors as "the amount of time needed for effective preparation, the amount of time actually available for preparation, the amount of time previously available for preparation and how assiduously the movant used that time, the extent to which the movant has contributed to his perceived predicament, the complexity of the case, the availability of assistance from other sources, [and] the probable utility of a continuance...." *Saccoccia,* 58 F.3d at 770. This list is neither exclusive nor universally applicable. For instance, the court typically will want to weigh a panoply of somewhat more ineffable concerns, including "the extent of inconvenience to others (such as the court, the witnesses, and the opposing party) should a continuance ensue, and the likelihood of injustice or unfair prejudice attributable to the denial of a continuance." *Id.*

■ After the trial court has ruled, appellate review is deferential. Each case is *sui generis,* and the compendium of relevant factors varies from situation to situation. Hence, the court of appeals, like the trial court, employs a case-specific approach. *See United States v. Torres,* 793 F.2d 436, 440 (1st Cir.), *cert. denied,* 479 U.S. 889, 107 S.Ct. 287, 93 L.Ed.2d 262 (1986). The appellate court, however, looks primarily to the persuasiveness of the trial court's reasons for refusing the continuance and gives due regard not only to the factors which inform that court's ruling but also to its superior point of vantage.

■ Here, the balance tilts heavily against the movant. For one thing, sentencing hearings are ancillary to the main event—the determination of guilt or innocence—and they are characterized by a certain informality in the presentation of proof. *See, e.g., United States v. Tardiff,* 969 F.2d 1283, 1287 (1st Cir.1992). Thus, while such hearings are important, less preparation time is required, on average, for a disposition hearing than for a trial. For another thing, once a defendant's guilt has been determined, the public has a heightened interest in the prompt dispensation of punishment. Accordingly, sentencing should occur with reasonable dispatch.

Third, the reasons given here in support of a further postponement do not hold water. Ottens' theory is that yet another continuance would have provided sufficient time to document other causes of the Bank's loss (e.g., the Bank's complicity, lack of interest in mitigation, and unsound operating procedures; the impact of a plummeting real estate market) and thereby have enabled him to demonstrate the appropriateness of a downward departure. *See e.g., United States v. Rostoff,* 53 F.3d 398, 406–07 (1st Cir.1995) (holding that the guidelines authorize discretionary departures to reflect multiple loss causation); *United States v. Gregorio,* 956 F.2d 341, 346–47 (1st Cir.1992) (similar); *see generally* U.S.S.G. § 2F1.1, comment. (n. 11) (Nov.1987). Ottens argues that the court's refusal to grant him the extra time reflected an arbitrary concern with expeditiousness at the expense of fairness, and thus invites reversal. *See, e.g., Morris v. Slappy,* 461 U.S. 1, 12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983); *United States v. Soldevila–Lopez,* 17 F.3d 480, 487–90 (1st Cir.1994).

But this reproof is mostly sound and fury, signifying little. The district court delayed the disposition hearing for more than seventeen months after accepting Ottens' guilty plea. The court granted eight successive sentencing continuances in response to Ottens' requests. On the last two occasions, Judge Gorton warned that the end was near. A court is not obligated to postpone sentencing indefinitely simply because a defendant, hoping against hope, desires more time to search for potentially helpful tidbits.

In this instance, the record confirms that the lower court was generous, rather than grudging, in the time allotted to the defense for preparation. Ottens' first lawyer had fifteen months within which to excavate the government's files and lay a foundation for a sentencing strategy. His second lawyer then had an additional forty-six days to prepare for the disposition hearing. The comprehensive sentencing memoranda filed on Ottens' behalf show beyond peradventure of doubt counsel's thorough preparation and his command of the facts. Consequently, the district

court did not abuse its discretion in declining to grant a ninth continuance.[4]

## IV.

### *The Refusal to Depart*

Ottens assigns error to the imposition of a sentence within the GSR. He maintains that the district court should have departed downward on the basis of multiple loss causation. *See, e.g., Rostoff,* 53 F.3d at 406–07. We lack jurisdiction to entertain the assigned error.

At sentencing, Judge Gorton gave two reasons for his refusal to impose a more lenient sentence. First, the judge found that the "facts of this case do not warrant a downward departure." Second, he ruled that the language of the plea agreement prohibited Ottens from seeking a downward departure. Since the first ground is dispositive of this facet of the appeal, we have no occasion to evaluate the second ground, and we take no view of its correctness.

For reasons that we have already explained at length (and which do not bear repeating here), it is the general rule that a defendant cannot appeal from the district court's discretionary decision not to depart below the guideline sentencing range. *See United States v. Pierro,* 32 F.3d 611, 619 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 919, 130 L.Ed.2d 799 (1995); *Tardiff,* 969 F.2d at 1290; *United States v. Amparo,* 961 F.2d 288, 292 (1st Cir.), *cert. denied,* 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992).[5] This appeal falls squarely within the sweep of the rule. The judge acknowledged that multiple loss causation could constitute a legally cognizable basis for a downward departure in some cases, but decided that no

departure for multiple loss causation was justified on the facts of this case. This is precisely the sort of discretionary, fact-specific, departure-declining determination that appellate courts lack the power to review. *See United States v. Morrison,* 46 F.3d 127, 130 (1st Cir.1995); *United States v. Romero,* 32 F.3d 641, 653 (1st Cir.1994); *United States v. LeBlanc,* 24 F.3d 340, 348 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994); *Tardiff,* 969 F.2d at 1290.

We need go no further. Here, the lower court clearly understood that multiple loss causation comprised a permissible ground for a downward departure, carefully evaluated Ottens' claim in light of that knowledge, and denied the departure request *in the circumstances of the particular case.* No appeal lies from that factbound determination.

***Affirmed.***

---

4. Ottens' claim that the government failed to disclose the basis of its loss computation is bootless. From the time that successor counsel first appeared, he had access to the presentence investigation report. In turn, that report satisfactorily explicated the anatomy of the claimed loss (which comprised most prominently $2,750,000 attributable to the Marlboro venture and $4,000,000 attributable to the North Andover fiasco).

5. A different situation obtains "when the sentencing court's declination to depart results from a mistake of law." *Pierro,* 32 F.3d at 619. Thus, "appellate jurisdiction may attach if it appears that the failure to depart stemmed from the sen-

tencing court's mistaken impression that it lacked the legal authority to deviate from the guideline range or, relatedly, from the court's misapprehension of the rules governing departures." *United States v. Gifford,* 17 F.3d 462, 473 (1st Cir.1994). But that exception takes hold only "[i]f the judge sets differential factfinding and evaluative judgments to one side, and says, in effect, 'this circumstance of which you speak, even if it exists, does not constitute a legally sufficient basis for departure.'" *Pierro,* 32 F.3d at 619. Nothing remotely resembling a mistake of law transpired in this instance.