# United States Court of Appeals

## For the First Circuit

No. 01-2539

KATHERINE MACAULAY, ET AL.,

Plaintiffs, Appellants,

v.

PETER P. ANAS, M.D.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya and Lipez, Circuit Judges.

Andrew D. Swain, with whom Messa & Associates, P.C. was on brief, for appellants.
Joseph L. Doherty, Jr., with whom Martin, Magnuson, McCarthy & Kenney was on brief, for appellee.

February 28, 2003

**SELYA**, **Circuit Judge**.  After undergoing an unsuccessful surgical procedure, plaintiff-appellant Katherine Macaulay sued for negligence.[1]  The case was tried to a jury, which returned a verdict in favor of her surgeon, defendant-appellee Peter P. Anas.  Macaulay appeals, assigning error to the district court's actions in (1) refusing to grant her eve-of-trial motion for a continuance, (2) placing certain limitations on the testimony of her principal expert witness, and (3) permitting cross-examination of her treating physician with respect to matters touching upon the standard of care.  Concluding, as we do, that these claims of error are without merit, we affirm.

## I. BACKGROUND

We start by sketching a broad picture of the case.  We bring that picture into sharper focus by adding more specific facts during our discussion of particular issues.

The appellant, like many other people, suffers from back problems.  In due course, she came under the care of Dr. Anas (a well-known orthopedist).  The physician recommended that she undergo spinal fusion surgery, and the appellant acquiesced.

Dr. Anas performed the surgery on September 11, 1992, at New England Baptist Hospital in Boston, Massachusetts.  The

---

[1]Macaulay's husband, Kenneth, and their three children also sued.  Since their claims are purely derivative, we treat the case as if Katherine Macaulay was the sole plaintiff and appellant.  Our decision is, of course, binding on all parties.

operation was not a success. When the Macaulay family moved to Philadelphia, the appellant came under the care of a different orthopedist, Dr. Todd Albert. On February 14, 1994, Dr. Albert performed corrective spinal surgery.

Displeased by what had happened on Dr. Anas's watch, the appellant brought a diversity action, 28 U.S.C. § 1332(a), in the United States District Court for the District of Massachusetts. She named as defendants Dr. Anas, the hospital,[2] and AcroMed Corporation (the manufacturer of the hardware used in the original surgery). She alleged, inter alia, that Dr. Anas had been negligent in using investigational bone screws, in improperly positioning them during the operation, and in failing to remove them afterwards.

Within a matter of weeks, the case was transferred, for purposes of centralized pretrial proceedings, to the Eastern District of Pennsylvania. See 28 U.S.C. § 1407 (describing procedures applicable to multidistrict litigation). The transfer was prompted by the pendency of hundreds of other cases involving manufacturers of investigational medical hardware. See In re Orthopedic Bone Screw Liab. Litig., 176 F.R.D. 158 (E.D. Pa. 1997). When the claims against the manufacturers were resolved, the

---

[2]On March 28, 2001, the parties filed a stipulation dismissing with prejudice all claims against New England Baptist Hospital. Accordingly, we make no further reference to the allegations against that defendant.

-3-

appellant's case was remitted to the District of Massachusetts. At that point, AcroMed was no longer a defendant.

On August 15, 2000, the district court referred the case to the Massachusetts Medical Malpractice Tribunal (the Tribunal). See Mass. Gen. Laws ch. 231, § 60B. On March 15, 2001, the Tribunal rendered a decision in favor of Dr. Anas, finding that the appellant's case exemplified "an unfortunate medical result." The appellant posted the $6,000 bond required in order to pursue her claim against Dr. Anas in court. See id.

Meantime, the district court had been attempting to compose a timeline leading to trial. The court initially scheduled the trial to commence on November 6, 2000, but postponed it sine die because the Tribunal had not yet acted. After March of 2001, the district court set a number of putative trial dates, but vacated all of them for one reason or another (in several instances to accommodate the appellant's counsel). The court finally settled upon a firm trial date of September 10, 2001, and rebuffed the appellant's eleventh-hour efforts to vacate that assignment.

The trial went forward on September 10, but the appellant's principal attorney, Joseph Messa, was not present. Instead, one of Messa's associates, Andrew Swain, took the lead. On September 24, 2001, the jury returned a defendant's verdict. This timely appeal ensued.

**II.  DISCUSSION**

We divide our discussion of the issues into three segments, corresponding to the appellant's assignments of error.

### A.  <u>Refusal to Grant a Continuance</u>.

The appellant calumnizes the district court for its refusal to vacate the September 10 trial assignment, asserting that the court's dogged insistence on going forward effectively deprived her of counsel of her own choosing.  In her view, Swain — a relatively inexperienced associate — was no substitute for the highly skilled advocate whom she had hired.  She mentions fleetingly a second reason why the district court should have granted a continuance:  her house had burned down approximately one month before the trial date.

We review the district court's denial of a continuance for abuse of discretion.  <u>United States</u> v. <u>Saccoccia</u>, 58 F.3d 754, 770 (1st Cir. 1995); <u>United States</u> v. <u>Devin</u>, 918 F.2d 280, 291 (1st Cir. 1990).  We discern none here.  After all, a party's right to counsel of her choosing is not absolute, and courts are not required either to wait endlessly for lawyers to make themselves available or to conform their calendars to suit attorneys' preferences.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Woodward</u>, 291 F.3d 95, 106 (1st Cir. 2002); <u>United States</u> v. <u>Noah</u>, 130 F.3d 490, 497 (1st Cir. 1997).

The record reflects that the trial court exhibited great patience in endeavoring to accommodate the appellant's counsel. The appellant requested no fewer than four trial continuances, including requests made in March, May, and June of 2001 due to conflicts with Messa's schedule. On each of these occasions, the district court yielded to counsel's scheduling constraints and delayed the trial. When all was said and done, these serial continuances moved the scheduled start of trial to July 9, 2001.

On July 6, the court held a pretrial conference. With the agreement of both parties, it vacated the July 9 trial assignment. In an effort to accommodate the vacation schedules of all concerned, the court proposed to start the trial on September 4, 2001. Messa asked for special consideration because he was planning to return from vacation that day. The court then suggested September 5, but Messa protested. The court yielded once more; it acceded to Messa's importunings and set trial to commence on September 10. But the court exacted a reciprocal commitment from Messa. It fixed the September 10 trial date only after the lawyer gave what was described as an "ironclad" guarantee that he or someone from his office would be available to try the case that day. On July 12, 2001, Messa confirmed that assurance in writing.

The English satirist, Jonathan Swift, wrote nearly three centuries ago that "promises and pie crusts are made to be broken." J. Swift, Polite Conversation (1738). So it was here. On August

-6-

30, 2001, Messa wrote to the district court requesting yet another continuance because he was to start a trial in Pennsylvania on September 10 and neither the appellant nor his Pennsylvania client would consent to having another lawyer appear. On September 4, the district court rejected Messa's request. Noting that the appellant previously had been granted multiple continuances, the court declared: "I picked a date satisfactory to you and you guaranteed me you would be available." Messa renewed his request, this time mentioning that the Macaulays' family home had burned down several weeks earlier. The court responded that it had selected the September 10 date at Messa's urging, that it had blocked off three weeks to accommodate the trial, and that it would not continue the case. Messa essayed yet a third request, advising the court that the appellant had threatened to sue Messa's firm if Swain tried the case and lost. The court stood firm.

We descry no hint of error. District courts enjoy broad discretion in administering their dockets. This discretion encompasses the granting and denial of requests for continuances. Saccoccia, 58 F.3d at 770. Mindful that the exigencies of managing a heavy caseload are real, appellate review of the denial of a motion to continue is highly deferential. An appellate court "looks primarily to the persuasiveness of the trial court's reasons for refusing the continuance and gives due regard not only to the factors which inform that court's ruling but also to its superior

point of vantage." United States v. Ottens, 74 F.3d 357, 360 (1st Cir. 1996). The burden is on the movant to demonstrate that the trial court, in refusing a continuance, "indulged in a serious error of law or suffered a meaningful lapse of judgment, resulting in substantial prejudice." Saccoccia, 58 F.3d at 770.

In sifting the record to determine whether this heavy burden has been carried, an inquiring court must consider the totality of the circumstances, including, in addition to the trier's rationale for denying the motion, the reasons that the movant contemporaneously advanced in support of her request for a continuance, the history of the proceedings, the probable utility of a continuance, the extent of inconvenience to others (e.g., the court, the witnesses, and the opposing party) should a continuance ensue, and the extent of any unfair prejudice to the movant should a continuance be denied. See id.

Here, the hallmark of the district court's handling of the case was patience, not hubris. Its stated rationale for refusing a further continuance was entirely plausible. In contrast, the appellant's claim of entitlement was weak, especially since Messa knew about the conflicting Pennsylvania trial assignment when he guaranteed that the appellant's case would go forward on September 10. Moreover, the history of the litigation buttresses the court's action. The court had been indulgent in trying to work around Messa's hectic schedule. Having granted

-8-

several continuances, the court was justified in drawing a line in the sand. Even then, the court did not set the September 10 trial date by fiat, but, rather, based it on Messa's unqualified assurance of his availability. Both the court and the adverse party relied on this assurance: the court had cleared its calendar, the defendant-doctor had adjusted his workload, and the defense had proceeded with its trial preparations on the reasonable assumption that the case would go forward. It was the court's prerogative — indeed, its duty — to weigh these facts in acting upon the appellant's request for yet another continuance. See Ottens, 74 F.3d at 360.

To say more on this point would be to paint the lily. While we are sympathetic to the appellant's plight, parties are bound by their attorneys' representations, see United States v. Woburn City Ath. Club, 928 F.2d 1, 6 (1st Cir. 1991), and courts are entitled to take those representations at face value. That Messa chose to do a juggling act by committing himself to begin trials in two different courts on the same date was regrettable — but it was not the court's responsibility to extricate him from this self-dug hole. Courts simply cannot afford to let lawyers' schedules dominate the management of their dockets. Given the totality of the circumstances, it was not an abuse of discretion

for the district court to insist that the trial begin as scheduled.[3]

## B. **Preclusion of Expert Testimony**.

The appellant next strives to convince us that the district court erred in precluding her expert witness, Dr. Robert Dunn, from testifying that the surgery performed by Dr. Anas was not medically indicated. We are not persuaded.

In order to place this assignment of error in perspective, we first inspect the relevant provisions of the Civil Rules. Under that regime:

> Except as otherwise stipulated or directed by the court, [a party's] disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case . . . , be accompanied by a written report, prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor . . . .

Fed. R. Civ. P. 26(a)(2)(B). Once such a disclosure is made, it must be kept current. See Fed. R. Civ. P. 26(e)(1) (explicating the duty to supplement discovery responses). Since an important object of these rules is to avoid trial by ambush, the district

---

[3]We see no need to deal at length with the house fire. In relation to the request for a continuance, that was plainly an afterthought. In all events, the appellant has not satisfactorily explained how that incident rendered it infeasible for her to proceed with the trial. We note, moreover, that the tenuous linkage that the appellant offered between the house fire and her need for a continuance went to damages (an issue that the jury never reached), not to liability.

court typically sets temporal parameters for the production of such information.  See, e.g., Fed. R. Civ. P. 16(b).  Such a timetable "promotes fairness both in the discovery process and at trial." Thibeault v. Square D Co., 960 F.2d 239, 244 (1st Cir. 1992).  When a party fails to comply with this timetable, the district court has the authority to impose a condign sanction (including the authority to preclude late-disclosed expert testimony).  Id. at 245.

Moving from the general to the particular, we trace the chronology of pertinent events in this case.  On March 21, 2000, the district court entered an order establishing a discovery cut-off date some six months in the future.  The court subsequently extended that date to October 27, 2000.  At a status conference held after the close of standard discovery, the court constructed a staggered template for the exchange of expert witnesses' reports and related depositions.  The deadline for the appellant's submission of reports was February 23, 2001.

Pursuant to this timetable, the appellant produced Dr. Dunn's report on February 21, 2001.  The report concluded that Dr. Anas had improperly positioned the screws that he placed in the appellant's spine and had compounded this negligence by not removing the screws after it had become apparent that the appellant was suffering significant nerve-root irritation.  On March 7, the parties filed a joint motion to vacate the extant March 19 trial

assignment and reassign the case for trial on April 30, 2001.[4] The district court granted them half a loaf, shifting the trial date to April 2, 2001.

On March 20, the parties took a videotaped deposition from Dr. Albert (the appellant's treating physician). This deposition was taken on the understanding that it would be used at trial in lieu of live testimony by Dr. Albert. Eight days later — and more than a month after the deadline had passed for submitting her expert witnesses' reports — the appellant produced a supplemental report from Dr. Dunn. In this report Dr. Dunn opined, for the first time, that the surgery that had been performed was not medically indicated.

The following day, the district court held a pretrial conference. The defense complained about the appellant's attempted injection of a new theory of liability well after the deadline had passed for divulging her expert witnesses' reports. The district court noted the imminence of trial and ruled that the parties were bound by the tenor of the reports that had been submitted on or before February 23. The court made an exception for certain additional x-ray and CT films that the appellant had belatedly

---

[4]There is some dispute as to whether both sides joined in the motion or, alternatively, whether the continuance was requested by the defense (because of the delayed production of records from the appellant's treating physician) and not opposed by the appellant. That dispute is immaterial for purposes of this appeal.

produced,[5] and, subsequently, reassigned the case for trial on May 7, 2001. Although the trial eventually was postponed until September 10, 2001, the appellant never sought to revisit the district court's preclusionary order.

This brings us to the standard of review. District courts have available a range of sanctions for the untimely production of discovery materials. In addressing such matters, trial judges must work a complicated equation, balancing fairness to the parties with the need to manage crowded dockets. Because trial judges tend to have an intimate knowledge of the variables that enter into the equation, see, e.g., Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1082 (1st Cir. 1989) (explaining that, "district judges . . . are, by and large, in a far better position than appellate tribunals to determine the presence of misconduct and to prescribe concinnous remedies"), appellate review of sanctions orders is deferential. See Thibeault, 960 F.2d at 243-44. It follows that when a party proffers expert testimony out of time and the district court opts to preclude it, the question on appeal is not whether we would have imposed the same sanction. Rather, the question is whether the district court's action was so wide of the mark as to constitute an abuse of discretion. Nat'l

---

[5]The appellant does not argue that this exception threw the court's order out of balance. In any event, since the delayed production was attributable to the appellant, such an argument would be insupportable.

Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 642 (1976) (per curiam); Thibeault, 960 F.2d at 243.

In answering this question, the court of appeals must consider a multiplicity of pertinent factors, including the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects. Thibeault, 960 F.2d at 244; Johnson v. H.K. Webster, Inc., 775 F.2d 1, 7-8 & n.7 (1st Cir. 1985). Surprise and prejudice are important integers in this calculus. Thibeault, 960 F.2d at 246; Johnson, 775 F.2d at 7 n.7. So too is an assessment of what the late disclosure portends for the court's docket. Salgado v. Gen. Motors Corp., 150 F.3d 735, 742 (7th Cir. 1998).

In this instance, the appellant faces a steep, uphill climb. The record shows beyond hope of contradiction that she had ample time to conduct discovery and to submit her expert reports within the period allotted by the district court.[6] Yet, she did not proffer the report limning the "unnecessary surgery" theory until more than a month after the applicable deadline had expired.

_____

[6]The appellant filed her complaint on September 6, 1996. Although the parties may have been somewhat limited in their ability to conduct discovery during the period that this case was involved in the multidistrict litigation process, they were certainly in a position to begin accumulating their expert testimony. That extended window of opportunity counsels persuasively in support of the district court's preclusionary order.

Moreover, the neoteric theory was not based on any newly discovered evidence, and the appellant has not advanced any real justification for its tardy emergence. To compound these failings, discovery was closed and trial was imminent at the time the supplemental report surfaced. Consequently, had the district court allowed the late submission, it would have had a Hobson's choice: either to force the defense to trial without appropriate preparation (such as targeted pretrial discovery) or to reopen discovery and vacate the trial assignment. Under those circumstances, it is surpassingly difficult to fault the court for refusing to overlook the discovery violation.

In an effort to blur this compelling picture, the appellant argues that the lower court should have permitted her to proceed because the defense could not credibly claim to have been surprised. This argument is little more than whistling past the graveyard. A careful review of the record shows that, although the "unnecessary surgery" theory arguably was covered by boilerplate language in the original complaint, the appellant did not actively pursue it at any time thereafter. The appellant's main theory of negligence, all along, was that Dr. Anas had improperly positioned the screws that he inserted into her spine, and, relatedly, had failed to remove them after they caused nerve-root irritation. The fact that the complaint peripherally addressed several other possible theories of negligence did not excuse the appellant's

-15-

breach of her obligation to disclose anticipated expert testimony in a timely fashion. It is one thing to tick off a laundry list of potential theories at the start of litigation. It is quite another to develop the theories that actually will be prosecuted and keep them in play. See, e.g., Torres-Rios v. LPS Labs., Inc., 152 F.3d 11, 16 (1st Cir. 1998) (refusing to entertain a claim that was implicit in a complaint, but not developed in later proceedings). This was clearly a new theory of liability.

The fact that the trial did not go forward until September 10, 2001, is irrelevant to our analysis. When the district court made its preclusionary ruling, trial was scheduled to start on May 7. No one anticipated that it would be postponed. And while this ensuing delay might have provided sufficient time for the parties to address the new theory of liability, the appellant did not ask the court to reconsider its ruling in light of the extra time available. A party who has the opportunity to ask the trial court for relief but fails to do so forfeits the right to claim, on appeal, that the relief should have been granted. See Anderson v. Beatrice Foods Co., 900 F.2d 388, 397 (1st Cir. 1990).

The bottom line is that the district court had a substantial basis for finding unfair surprise. Moreover, on these facts surprise and prejudice go hand in hand. Common sense suggests that when a party makes a last-minute change that adds a

new theory of liability, the opposing side is likely to suffer undue prejudice. The case law reflects this understanding. E.g., Thibeault, 960 F.2d at 246-47. Here, the appellant introduced a new theory of liability only days before the anticipated trial date. Allowing her to pursue that theory would have placed an untenable burden on the defense and, in the bargain, would have contravened the spirit of the discovery rules. See United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958) (explaining that the purpose of pretrial discovery is to "make trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent"). We conclude, therefore, that the district court acted well within the encincture of its discretion in ordering preclusion.

## C. **Cross-Examination**.

The appellant asseverates that the district court abused its discretion in allowing defense counsel to elicit standard of care testimony during his cross-examination of Dr. Albert. In this regard, the appellant posits that she did not identify Dr. Albert as an expert witness who would offer standard of care testimony; that permitting him to discuss the standard of care undermined the physician-patient relationship; and that, in all events, the testimony should have been excluded under Fed. R. Evid. 403.[7] The

---

[7]The rule provides in pertinent part:

Although relevant, evidence may be excluded if

-17-

phrasing of this asseverational array distorts the real issue: whether or not the disputed cross-examination went beyond the scope of the witness's direct examination.

Dr. Albert testified by means of a videotaped deposition. During direct examination by the appellant's counsel, he testified that, in the course of spinal fusion surgery, screws are supposed to be placed inside the pedicles of the patient's spine. He then noted that several of the screws that Dr. Anas had inserted in the appellant's spine were not entirely within the pedicles. In line with this observation, he characterized the screws as "malpositioned" or "misplaced."

On cross-examination, Dr. Albert elaborated upon these statements. He reiterated that the screws were not located entirely within the pedicles of the spine (and, thus, were malpositioned or misplaced), but he then acknowledged that this fact did not necessarily signify a deviation from the applicable standard of care. In much the same vein, he said that, in characterizing the screws as malpositioned or misplaced, he did not mean to suggest that Dr. Anas had transgressed the standard of

its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .

Fed. R. Evid. 403.

-18-

care.  At trial, the district court admitted these elaborations over the appellant's objections.

It is elementary that the scope of permissible cross-examination is delimited by the scope of the witness's direct examination.  See Fed. R. Evid. 611(b); see also United States v. Lara, 181 F.3d 183, 189 (1st Cir. 1999) (describing as "standard fare" a cross-examiner's ability "to inquire into issues . . . related to and made relevant by [direct examination]").

It is, of course, unrealistic to expect that direct examination and cross-examination will be perfectly congruent.  See, e.g., Irons v. FBI, 880 F.2d 1446, 1462 (1st Cir. 1989) (en banc) (noting, in dictum, that by testifying on direct examination, witnesses may "expose themselves [on cross-examination] to a range of questions which may go well beyond what the witness, or the examiner on direct, chooses to present during the case in chief").  The latter need only be reasonably related to the former, and matching the two requires the district court to make a series of judgment calls.  A district court's decision either to permit questioning as falling within the scope of the direct or to exclude it as falling outside that scope is evaluated for abuse of discretion.  Lara, 181 F.3d at 199; United States v. Smith, 145 F.3d 458, 462 (1st Cir. 1998).  Under this standard, a decision will be overturned only when the court misapprehends the applicable law or commits a meaningful error in judgment.  Anderson v.

Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988). Even an erroneous ruling will not justify upsetting a jury verdict unless the error affects the aggrieved party's substantial rights. See Fed. R. Civ. P. 61; Fed. R. Evid. 103.

Seen in this light, the pivotal question here is whether the appellant's direct examination opened the door to the disputed cross-examination. Although the appellant asserts that Dr. Albert was strictly a fact witness, not an expert witness, her direct examination did not hew to that line. In response to questions on direct, Dr. Albert testified unequivocally that the screws used in spinal fusion surgery should be placed within the boundary of the pedicles. He then testified that several of the screws that Dr. Anas had inserted in the appellant's spine were not so configured; instead, they were malpositioned or misplaced. Although the appellant labors to characterize these comments as statements of fact, they bore directly on the standard of care required in the course of performing spinal fusion surgery. The statements also suggested (or, at least, supported a reasonable inference) that Dr. Anas had violated this standard in fusing the appellant's spine. The witness's use of terms such as "malpositioned" and "misplaced" implied fault. See Oxford Engl. Dict. 1708 (compact ed. 1971) (defining "malpositioned" as "wrongly or badly positioned"); id. at 1815 (defining "misplaced" as "put in a wrong place"). Thus, a

-20-

reasonable jury easily could have construed Dr. Albert's statements to mean that Dr. Anas had committed actionable malpractice.

The defense was not required to let this potentially damaging inference hang in the air. The ground that is covered on direct examination sets the boundaries of permissible cross-examination. See Lara, 181 F.3d at 199; see also Fed. R. Evid. 611(b). Consequently, the cross-examiner had every right to probe the meaning of the witness's statements in an effort to dispel any intimation of negligence. In other words, by asking questions that related both to the standard of care and to the breach of that standard, the appellant effectively opened the door for the cross-examiner to address and clarify those issues. See, e.g., United States v. Fortes, 619 F.2d 108, 121 (1st Cir. 1980) (holding that direct examination as to specific issues "opened the door to a full and not just selective discussion of these matters" on cross-examination).

Here, the cross-examiner merely walked through the open door and had the witness explain what he meant. Cross-examiners must be given reasonable latitude to delve into areas related to a witness's direct examination, and that latitude was not exceeded in this instance. Questions that serve primarily to clarify matters raised on direct examination are, virtually by definition, within the proper scope of cross-examination.

-21-

There is one conceivable gray area. The cross-examiner asked Dr. Albert about the reported percentage of screws that do not end up entirely within the pedicles in operations performed by experienced orthopedic surgeons throughout the United States. The witness responded that the figure is "as high as 15 to 20 percent." This general question arguably went too far. But even assuming that it exceeded the scope of the direct examination — there are arguments both ways and much leeway for the trier's judgment — any error was harmless. The statistic, in and of itself, cuts both ways, and, moreover, the same percentages were vouchsafed during the trial, without objection, by expert witnesses for both sides.

The short of it, then, is that the district court's admission of the testimony gleaned through Dr. Albert's cross-examination did not constitute an abuse of discretion. That said, the appellant's remaining objections need not detain us. The argument that the cross-examination somehow infringed upon the physician-patient relationship is jejune; it was the appellant, after all, who sued for personal injuries and made Dr. Albert's testimony a centerpiece of her case. As for the argument that the questions and answers should have been excluded under Fed. R. Evid. 403, the question is one not merely of prejudice, but of unfair prejudice. Onujioqu v. United States, 817 F.2d 3, 6 (1st Cir. 1987). The juxtaposition of the witness's direct testimony in the

context of the case as a whole rendered the evidence gleaned through cross-examination both probative and fair.

### III. CONCLUSION

We need go no further.[8]  After scrutinizing the record, we are fully persuaded that the district court handled the case with consummate skill and patience.  Because the appellant received a fair trial, unblemished by discernible error, the jury verdict must stand.


**Affirmed**.

---

[8]The appellant briefed a fourth claim of error, namely, her contention that the Tribunal's decision to require a bond was mistaken.  We do not reach this matter, however, since the appellant conceded during oral argument that the point was material only in the event of a remand.