John GARRETT, Plaintiff,

v.

TANDY CORPORATION d/b/a
Radio Shack, Defendant.

No. CIV.00–384–P–H.

United States District Court,
D. Maine.

March 24, 2003.

Jeffrey Neil Young, McTeague, Higbee, MacAdam, Case, Watson & Cohen, Topsham, ME, for John Garrett.

Jonathan Shapiro, Moon, Moss, McGill, Hayes & Shapiro, P.A., Melinda J. Caterine, Moon, Moss, McGill, Hayes & Shapiro, P.A., Portland, ME, for Tandy Corporation, Radio Shack.

### MEMORANDUM DECISION ON ·DEFEN-DANT'S MOTION TO EXCLUDE EX-PERT TESTIMONY

DAVID M. COHEN, United States Magistrate Judge.

Defendant Tandy Corporation d/b/a Radio Shack ("Tandy") moves pursuant to Federal Rules of Civil Procedure 16(f)· and 37(b)(2) to strike the designation of plaintiff John Garrett's psychiatric expert, .Hugh F. Butts, M.D., and to exclude his testimony during motion practice and trial. *See* Defendant's Motion To Exclude Testimony of Plaintiff's Psychiatric Expert, etc. ("Motion") (Docket No. 38). For the reasons that follow, that request is granted.

### I.  Factual Context

Garrett filed the instant race-discrimination · action on November 30, 2000, alleging violation of 42 U.S.C. §§ 1981 and 1982 (Count I), violation of the Maine Human Rights Act ("MHRA") (Count II) and defamation (Count III). *See* Complaint and Demand for Jury Trial (Docket No. 1). In due course Tandy filed a motion to dismiss Counts I and III of the complaint as well as Garrett's request for injunctive relief. *See* Defendant's Rule 12(b)(6) Motion To Dismiss, etc. ("Motion To Dismiss") (Docket No. 3). The complaint subsequently was amended. *See* First Amended Complaint and Demand for Jury Trial ("Amended Complaint") (Docket No. 7). By decision dated June 12, 2001 the court granted the Motion To Dismiss as to Counts I and III of the Amended Complaint and denied it as to injunctive relief. *See* Memorandum Decision and Order on Defendant's Motion To Dismiss Counts I and III of the Amended Complaint (Docket No. 10). Count II, a pendent state claim, eventually also was dismissed for lack of a remaining basis for federal jurisdiction, and final judgment was issued in favor of Tandy as to all counts. *See* Order Dismissing Count II of the Amended Complaint (Docket No. 26); Judgment (Docket No. 27).

Garrett filed a notice of appeal to the First Circuit, which by decision dated July 9, 2002

affirmed dismissal of Count I, reversed dismissal of Count III and remanded the case for further proceedings. *See* Notice of Appeal (Docket No. 28); Judgment (Docket No. 30). On September 1, 2002 the court issued a scheduling order directing the plaintiff to designate experts, and provide with respect to each of them a complete statement of all opinions to be expressed and the basis and reasons therefor, by October 30, 2002. *See* Scheduling Order, etc. ("Scheduling Order") (Docket No. 32). The Scheduling Order also set deadlines of January 15, 2003 for completion of discovery and January 22, 2003 for the filing of any dispositive motions. *See id.* at 2.

Plaintiff's counsel Jeffrey Neil Young informed defendant's counsel, Jonathan Shapiro and Melinda Caterine, by letter dated October 30, 2002, of the designation of three expert witnesses, among them Dr. Butts, a psychiatrist and psychoanalyst licensed to practice in New York. *See* Exh. A to Motion at 2.[1] The letter stated in relevant part:

> ... [Dr. Butts] has testified in a number of both civil and criminal cases regarding the psychological sequelae and psychiatric impact on the psyche of black individuals who are discriminated against on the basis of their race, including instances of racial profiling. Based upon the facts of this case as explained to Dr. Butts by the undersigned and paralegal Nancy Pollock, and as set forth in the Amended Complaint and the First Circuit opinion, it is anticipated that Dr. Butts will testify that Plaintiff's claim that he was humiliated and upset by the false allegation premised upon Mr. Garrett's race that he stole or participated in the theft of a laptop computer is a reaction common to victims of racial profiling or discrimination. Dr.

Butts is further anticipated to testify that Mr. Garrett in fact suffered psychological pain and suffering as a result of his perception that he was the victim of racial profiling.

*Id.* at 2–3.

By letter dated November 8, 2002 Caterine requested that Garrett attend a Rule 35 examination with respect to his claim for emotional-distress damages. *See* Exh. B. to Motion. By letter dated November 13, 2002 Young informed Caterine that he was unwilling to agree to this request. *See* Exh. C to Motion. Nothing further was heard from Tandy with respect to this matter until on or about December 9, 2002 when Caterine indicated her intention to hold a discovery conference with the court with respect to the Rule 35 matter. Plaintiff's Opposition to Defendant's Motion To Exclude Testimony of Plaintiff's Psychiatric Expert ("Opposition") (Docket No. 45) at 2–3.[2] A discovery conference was scheduled with the court for December 11, 2002. *See* Exh. D to Motion.

On December 11, prior to the scheduled conference, Young contacted Caterine with a proposal for resolving the dispute. Motion at 2; Opposition at 3. Specifically, Young advised Caterine that he agreed that if Dr. Butts were to be called as a witness, Tandy apparently would be entitled to a Rule 35 examination. *See* Opposition at 3. Accordingly, he questioned whether, if he were to withdraw Dr. Butts and agree that Garrett was seeking only "garden variety" emotional-distress damages, Tandy would agree to withdraw its designation of Dr. Drukteinis, whom it had designated to testify regarding Garrett's emotional and mental well-being. *See id.* Caterine stated that she could not agree at that time to withdraw the Druktein-

---

1. Following issuance of the Scheduling Order, Young contacted three individuals prior to contacting Dr. Butts about serving as an expert regarding the emotional sequelae of racial profiling. Affidavit of Jeffrey Neil Young ("Young Aff.") (Docket No. 46) ¶ 3. None were available to serve as experts, although one agreed to do so after Young already had designated Dr. Butts. *Id.*

2. I note that some relevant facts are set forth only in the parties' briefs, uncorroborated by affidavits or other supporting materials, and that

in some particulars these uncorroborated accounts diverge. For purposes of resolution of the instant motion, I need not decide whether such uncorroborated "facts" are cognizable or, if so, whose account is to be credited, inasmuch as regardless whether Young's or Caterine's version is accepted, the outcome is the same. Therefore, for purposes of setting forth the factual context in this case, I credit Young's uncorroborated account to the extent it diverges from that of Caterine.

is designation but would check with her client. *See id.* That morning, Young faxed to Caterine decisions standing for the proposition that a garden-variety claim of emotional distress does not waive the psychotherapist-patient privilege. *See* Exh. E to Motion.[3] As a result of this discussion, the December 11 discovery conference with the court was cancelled. *See* Motion at 2.

On December 13 and 16, 2002 Garrett responded to requests for production of documents and to interrogatories served by Tandy, refusing to answer questions regarding his physical or mental well-being or to produce medical records on the basis that his emotional damages were incidental to the racial profiling he claimed to have suffered, *i.e.,* garden-variety. *See* Exh. F to Motion at 9–10; Exh. G to Motion at 5–6. Garrett's deposition was taken on December 16, 2002, at which time Young lodged a continuing objection on relevancy grounds to lines of inquiry regarding Garrett's medical and mental health history. *See* Exh. H to Motion at 166, 169. The following dialogue between counsel ensued:

MS. CATERINE: So, I assume that if [the Butts] designation is not withdrawn, I'm going to be allowed to ask those sorts of questions.

MR. YOUNG: No. I told you I'm going to withdraw it and my understanding was you were going to withdraw Drukteinis.

MS. CATERINE: Well, our discussion was that we would see what was said at the deposition today . . . .

MR. YOUNG: Okay. All right. Just so that the record is clear, what I said is that if you're entitled to have an examination by

Dr. Druktenis [sic] . . . [t]hen I'm reserving the right to retain Dr. Butts, so—

MS. CATERINE: So, are you saying that you've already withdrawn the designation with regard—

MR. YOUNG: I haven't withdrawn it because we were waiting to see what came out of the deposition today is my understanding.

MS. CATERINE: Okay. Because this is also an issue that we're going to have [to] discuss with the Magistrate depending on what our ultimate decision is in terms of whether there will be experts.

MR. YOUNG: Okay.

*Id.* at 170–72.

Subsequently, Young spoke with Dr. Butts, who persuaded Young that Garrett might not necessarily have suffered simple garden-variety emotional damages, although Dr. Butts could not say so definitively without examining Garrett. Opposition at 4. By e-mail dated December 19, 2002 Young informed Caterine that he would let her know the following day (a Friday) or by Monday at the latest whether he had decided to withdraw his designation of Dr. Butts. *See* Exh. A to Defendant's Reply Memorandum in Support of Motion To Exclude Testimony of Plaintiff's Psychiatric Expert ("Reply") (Docket No. 51). On December 20, 2002 Young informed Caterine that he would not withdraw his designation of Dr. Butts. *See* Opposition at 4. At about the same time Young agreed that Garrett would submit to the Rule 35 examination, which was scheduled for January 8, 2003, and represented that he would attempt to produce Garrett's medical records in advance of that date. *See* Motion at 3.[4] By letter dated January 3, 2003

---

**3.** A so-called "garden variety," or "incidental," claim of emotional distress "merely seek[s] recompense for those emotional injuries that are likely to arise as a fair consequence of an underlying tort." *Morrisette v. Kennebec County,* Civ. No. 01–01–B–S, 2001 WL 969014, at *2 (D.Me. Aug.21, 2001). "In this way, they do not make recourse to the substance of a privileged communication[.]" *Id.*

**4.** Young states that "[o]bviously implicit in this decision was the notion that Plaintiff was not necessarily going to claim that his emotional damages were only those of a garden variety; otherwise he would not have agreed to submit to

the Rule 35 examination." Opposition at 4. Caterine argues persuasively that this was not obvious. *See* Reply at 4 n. 3. A plaintiff theoretically could use an expert to bolster a claim of garden-variety emotional-distress damages, thus potentially entitling a defendant to conduct a Rule 35 examination. *See, e.g., Flanagan v. Keller Prods., Inc.,* No. CIV. 00–542–M, 2001 WL 1669379, at *1 (D.N.H. Dec.18 2001) (". . . Rule 35 motions are typically granted when one or more of the following factors are present: 1. a cause of action for intentional or negligent infliction of emotional distress; 2. an allegation of a specific mental or psychiatric injury or disorder; 3. a claim of unusually severe emotional distress;

Young requested Garrett's medical records from the Togus V.A. Hospital. *See* Exh. B to Reply.

Garrett attended his Rule 35 examination as scheduled on January 8, 2003. *See* Motion at 3. During the examination, he refused to respond to a number of questions posed by Tandy's psychiatric expert, Dr. Drukteinis, including questions regarding his marital relationship and criminal record that he willingly answered when evaluated by his own expert, Dr. Butts. *See id.* at 3–4; *see also* Exh. E to Reply, ¶ 2. He also omitted to tell Dr. Drukteinis about his prior alcohol abuse and family history of psychiatric disorders and refused to complete the MMPI. *See* Exh. I to Motion; Exh. E to Reply, ¶¶ 3, 5. As a result, Dr. Drukteinis was unable to perform a complete evaluation of Garrett. *See* Exh. E to Reply, ¶ 6.[5]

The Veterans Administration did not produce the requested records until January 10, 2003, at which time Young immediately provided them to Tandy without reviewing them first. *See* Opposition at 4. These records established that Garrett had a history of alcohol abuse and that his mother was diagnosed with paranoid schizophrenia. *See* Motion at 4; Exh. E to Reply, ¶ 3. Also on January 10, Garrett filed an assented-to motion to extend the discovery deadline to January 31, 2003 and the deadline for the filing of dispositive motions to February 14, 2003. *See* Plaintiff's Assented To Motion for an Enlargement of Deadlines and for One Additional Deposition (Docket No. 36). That motion was granted on January 14, 2003. *See* Endorsement to *id.*

Tandy originally scheduled Dr. Butts' deposition for January 10, 2003 (which, per an e-mail from Young to Caterine dated December 2, 2002, was the first available date for that deposition). *See* Motion at 4; Exh. J thereto. Young subsequently informed Caterine that the deposition would have to be rescheduled to January 17, 2003 because of Dr. Butts' schedule. *See* Motion at 4. At Dr. Butts' deposition on January 17, 2003 he stated that he evaluated Garrett on January 14, 2003 in a meeting that was scheduled about a week prior to Dr. Butts' deposition, *see* Exh. K to *id.* at 31–33, and that he did not form any opinions in this case until he evaluated Garrett that day, *see id.* at 15–17.[6] Before designating Dr. Butts as an expert, Young sent him the proposed designation and he approved its language. Young Aff. ¶ 2.

Dr. Butts further testified during deposition that even as of then he had not fully formed his opinions regarding Garrett and that there were additional records he would like to review and people he would like to interview for purposes of doing so. *See id.* at 30–31, 99–105, 191–93. He testified that in his opinion Garrett had post-traumatic stress disorder and psychosis attributable to the events at Radio Shack, *see id.* at 107–08, 112–13, 116–18; however, during the course of the deposition, he changed his diagnosis to schizophrenia disorder, paranoid type, *see id.* at 181. He testified that Garrett's marital problems, hypertension, gastric reflux, loss of concentration, anger and rage all were exacerbated by the incident at Radio Shack and said he would not be surprised if Garrett developed prostate cancer as a result of the

---

4. the plaintiff's offer of expert testimony to support a claim of emotional distress; and/or 5. the plaintiff's concession that her mental condition is 'in controversy' within the meaning of Rule 35.").

5. According to Young, he was not made aware until the filing of this Motion that Garrett had refused to cooperate during the Rule 35 examination, even though on the date of that examination he was in the midst of a deposition related to this case and could have been reached at any time. *See* Opposition at 4. However, prior to the filing of the instant motion, Caterine notified the court, by letter dated January 23, 2003, indicating it was copied to Young, that Garrett had not

cooperated during the Rule 35 examination. *See* Exh. C to Reply.

6. The Butts deposition was not postponed to allow Dr. Butts to evaluate Garrett but rather because of ongoing confusion over whether Dr. Butts would testify at all in this matter. *See* Opposition at 5. Upon learning that Dr. Butts' testimony might not be needed, Young had phoned him to inform him his deposition likely would not be taken on January 10, 2003, and Dr. Butts had scheduled other matters. *See id.* Once Garrett agreed to the Rule 35 examination, it was evident that Dr. Butts would need to examine him to thresh out the designation and respond to any claims by Dr. Drukteinis. *See id.*

stress experienced from that incident. *See id.* at 22–23, 56, 86–87, 91, 118–19.

As of the date of the filing of the Motion (on January 30, 2003), none of Garrett's other medical records had been produced, although Young represented that they would be obtained and produced. *See* Motion at 4. Subsequently, the following records were provided: records of Dr. Hanna, on February 12, 2003, records of Mid Coast Hospital, on February 13, 2003 and records of Parkview Hospital, on February 19, 2003. *See* Opposition at 9 n. 3. As of the time of the filing of the Opposition, Young was still awaiting records from Walter Reed Army Hospital, Newport Naval Hospital and Bethesda Naval Hospital. *See id.* As of the time of the filing of Tandy's reply memorandum, Garrett still had not answered Tandy's medical-related interrogatories or otherwise provided Tandy with a list of doctors with whom he had treated in the past ten years. Reply at 7 n. 7.

## II. Analysis

In seeking to exclude Dr. Butts' testimony from motion practice and trial, Tandy invokes Federal Rules of Civil Procedure 16(f) and 37(b)(2). *See* Motion at 1. Rule 16(f) provides, in relevant part: "If a party or party's attorney fails to obey a scheduling or pretrial order, . . . the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D)." In turn, Rule 37(b)(2) provides, in relevant part: "If a party . . . fails to obey an order to provide or permit discovery, . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: . . . (B) An order . . . prohibiting that party from introducing designated matters in evidence[.]"

As the First Circuit recently has reemphasized in the context of disclosure of information regarding expert witnesses:

Since an important object of [the Federal Rules of Civil Procedure] is to avoid trial by ambush, the district court typically sets temporal parameters for the production of such information. Such a timetable promotes fairness both in the discovery process and at trial. When a party fails to comply with this timetable, the district court has the authority to impose a condign sanction (including the authority to preclude late-disclosed expert testimony).

*Macaulay v. Anas,* 321 F.3d 45, 50 (1st Cir. 2003) (citations and internal quotation marks omitted).

The Scheduling Order required that the plaintiff's experts be designated, and a complete statement of all opinions to be offered and the bases and reasons therefor be tendered, to the defendant by October 30, 2002. Although Garrett did in fact tender an expert designation to Tandy on that date, it was deficient inasmuch as it did not reflect the finally formed opinions of Dr. Butts and the bases and reasons therefor. Young spoke about the case with Dr. Butts, who approved the wording of the designation. However, Dr. Butts had not then examined Garrett or reviewed any of his medical records. Thus, Young could not be confident as of October 30, 2002 that the designation did in fact set forth a complete statement of all opinions to be expressed by Dr. Butts and the bases and reasons therefor. If, as things turned out, Dr. Butts' opinions largely conformed with the designation, all would be well. The designation, although technically deficient when offered, would be validated after the fact. Yet, if by contrast Dr. Butts' opinions diverged from those set forth in the initial designation, its underlying deficiency would be exposed. This was the risk Young took.

As things turned out, Young perhaps inadvertently magnified this risk by his conduct during the interim when the parties reached an impasse on the questions of whether Garrett would submit to a Rule 35 examination or the designations of Drs. Butts or Drukteinis would be withdrawn. During that time, Young refrained from requesting Garrett's medical records or sending him for consultation with Dr. Butts—even going so far as to inform Dr. Butts that the deposition scheduled for January 10, 2003 was unlikely to occur, as a result of which Dr. Butts scheduled other matters for that day. Meanwhile, Young took the position in response to discovery requests and at Garrett's deposition that inasmuch as Garrett's

claimed emotional distress was of "garden variety," questions and requests regarding Garrett's medical and mental history and records were irrelevant.

By December 20, 2002, when Young informed Caterine that he would move forward with Dr. Butts, both the holidays and the original January 15, 2003 deadline for completion of discovery loomed. Dr. Butts had persuaded Young that Garrett might be suffering from something more than garden-variety emotional distress, although Dr. Butts (who still had not seen Garrett or his medical records) could not at that point be certain. But no one told Caterine (or Tandy) that. Young's argument notwithstanding, *see* Opposition at 4, the fact that Garrett was now claiming more than garden-variety emotional-distress damages was not obvious simply because Garrett had agreed to submit to a Rule 35 examination and had decided to press on with Dr. Butts after all.

The magnitude of the risk Young had taken became clear at Dr. Butts' deposition on January 17, 2003—approximately two weeks prior to the discovery deadline (as extended) and one month prior to the new deadline for the filing of dispositive motions. Dr. Butts still had not done what the Scheduling Order presupposed would have been done prior to October 30, 2002: formulate opinions concerning the subject matter about which he was to testify. Worse, to the extent he expressed tentative opinions, they bore no recognizable relationship to those set forth in the designation (or to the interim position Young had taken that his client had suffered only garden-variety emotional-distress damages). Indeed, the testimony was somewhat of a shocker: that Garrett was suffering from post-traumatic stress disorder and psychosis attributable to the events at Radio Shack (or perhaps instead from schizophrenia disorder, paranoid type); that Garrett's marital problems, hypertension, gastric reflux, loss of concentration, anger and rage all were exacerbated by the incident at Radio Shack; and even that Garrett might develop prostate cancer as a result of the stress experienced from that incident.

Not only was Tandy blindsided by this barrage of serious new emotional-distress allegations but also, to make matters worse, it lacked a complete set of Garrett's medical and mental-health records and was handicapped by his lack of cooperation during the Rule 35 examination a few days earlier.

As the parties note, *see* Motion at 6; Opposition at 6, exclusion of expert testimony is "usually viewed as the extreme sanction for dilatory conduct or inadvertent delay in the prosecution of trial preparations and the development of testimony," *St. Joseph Hosp. v. INA Underwriters Ins. Co.*, 117 F.R.D. 19, 21 (D.Me.1987). However, it is warranted in this case. While the picture that emerges is not necessarily one of bad faith, it is one of calculated risks that paved the way for an eleventh-hour "ambush" of Tandy. As was the case in *Macaulay*, in which the plaintiff's expert interjected a new theory of medical negligence into the case after discovery had closed and when trial was imminent, "[c]ommon sense suggests that when a party makes a last-minute change that adds a new theory of liability, the opposing side is likely to suffer undue prejudice." *Macaulay*, 321 F.3d at 52.

Tandy catalogues a number of efforts that would have to be made in an attempt to absorb the blow delivered by Dr. Butts' testimony, including obtaining complete answers to medical interrogatories and complete responses to document requests, redeposing the plaintiff, his wife and his brother, requiring the plaintiff to resubmit to a Rule 35 examination and deposing his treating physicians. *See* Motion at 8; see also Exh. E to Reply ¶¶ 4–7. I am satisfied that such efforts reasonably would have to be undertaken to attempt to mitigate the damage.

Moreover, as Tandy points out, *see* Motion at 8, there are subtler but equally significant repercussions in terms of the need to reevaluate overall trial strategy, *see, e.g., INA*, 117 F.R.D. at 22 ("Not only will Defendants have to bear the considerable time and financial burdens of deposing these experts, but Defendants will also have to reevaluate all of the evidence gathered over the course of the discovery period. Witnesses—especially experts—do not testify in a vacuum."); *Central Me. Power Co. v. Foster Wheeler Corp.*, 115 F.R.D. 295, 298 (D.Me.1987) ("There are only so many days in a week and so many hours in a day, and the prejudice effected by the

granting of Hartford's motion would not be an inability to depose Hartford's experts or to name opposing experts, but the ineluctable diversion of time and resources from other areas of trial preparation.").

Under the circumstances, Tandy's claim of "severe prejudice," *see* Motion at 8, rings true. To sum up, Garrett had sufficient time, upon remand of this case from the First Circuit, to secure an expert on the issue of his emotional damages, to obtain a consultation and to generate a meaningful opinion prior to the designation deadline of October 30, 2002. In choosing not to do so, he took a calculated risk. This risk was exacerbated by continuing neglect of these preparations as the discovery deadline neared. While arguably the court could now make accommodations to permit the use of Dr. Butts, I am disinclined to impose on the court, Tandy or Tandy's counsel the burden of mitigating the damage flowing from the sizable risk that Garrett and his counsel took. *See Foster Wheeler,* 115 F.R.D. at 298–99 ("The prejudice occasioned by a concealment or late disclosure of important discovery materials or expert testimony will almost always be curable by postponing trial and allowing the opposing party time to regroup. If the Court were required to mechanically grant such postponements, regardless of the surrounding circumstances and in the absence of any showing of extenuating circumstances or good cause, its pretrial deadlines could always be disregarded with impunity.").

### III. Conclusion

For the foregoing reasons, Tandy's motion to strike the designation of Garrett's expert Hugh F. Butts, M.D., and to exclude his testimony from both motion practice and trial is **GRANTED.**[7]

*SO ORDERED.*

---

7. Tandy further requests that the plaintiff be required to pay for the costs resulting from his course of conduct, including, but not limited to, costs of deposition, expert witness fees, reasonable attorney's fees and travel expenses. *See* Motion at 10. Had Garrett timely disclosed the full scope of Dr. Butts' opinions, Tandy would have incurred deposition costs, expert witness fees, travel expenses and so forth both in deposing Dr. Butts and the plaintiff's treating physicians and in preparing its own defense and its own experts. I therefore decline to order any reimbursement of fees or expenses.