**OMEGAFLEX, INC., Plaintiff**

v.

**PARKER HANNIFIN CORPORATION, Defendant**

**No. CIV.A. 02–30022–MAP.**

United States District Court,
D. Massachusetts.

March 31, 2006.

William J. Cass, Steven Michael Coyle, Michael J. Rye, Cantor Colburn LLP, Bloomfield, CT, Brian J. Hairston, Connolly Bove Lodge & Hutz LLP, Wilmington, DE, Charles Francis O'Brien, Cantor Col-

burn LLP, Bloomfield, CT, for Omegaflex, Inc., Counter Defendant.

Kenneth G. Cole, Luke L. Dauchot, Thompson Hine LLP, Cleveland, OH, Bruce E. Falby, DLA Piper Rudnick Gray Cary U.S. LLP, Boston, MA, Rudolf E. Hutz, Connolly Bove Lodge & Hutz LLP, Wilmington, DE, Jeffrey C Metzcar, Thompson Hine LLP, Dayton, OH, Harold Pezzner, Connolly Bove Lodge & Hutz LLP, Wilmington, DE, for Parker Hannifin Corporation, Counter Claimant.

*MEMORANDUM AND ORDER RE-GARDING PLAINTIFF'S MO-TIONS FOR SUMMARY JUDG-MENT AND DEFENDANT'S SUBSTITUTE MOTION FOR SUMMARY JUDGMENT* (Dkt. Nos. 55, 57, & 83)

PONSOR, District Judge.

## I. *INTRODUCTION*

Plaintiff, OmegaFlex, Inc. ("Omega-Flex"), has filed this two-count action alleging that Defendant, Parker Hannifin Corporation ("Parker"), has infringed its patents on a fitting used to effectuate leak-tight, metal-to-metal seals in flexible gas piping systems. Defendant denies infringement and has filed a counterclaim challenging the validity of Plaintiff's patents.

Plaintiff now moves for summary judgment on its own claim of infringement and on Defendant's counterclaim charging that its patents are invalid. Defendant opposes these motions and seeks summary judg-

ment of invalidity of the claims of Plaintiff's patents.

For the reasons set forth below, the court will: (1) allow Plaintiff's motion for summary judgment of infringement, (2) allow Plaintiff's motion for summary judgment that its patents are not invalid, and (3) deny Defendant's substitute motion for summary judgment of invalidity.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. *The Patents–in–Suit.*

On June 27, 2000, the United States Patent and Trademark Office ("PTO") issued Patent No. 6,079,749 ("the '749 patent") to Plaintiff. Shortly thereafter, Defendant requested that the PTO reexamine the '749 patent, and the PTO ultimately provided Plaintiff with a Reexamination Certificate.[1] On August 6, 2002, the PTO issued to Plaintiff Patent No. 6,428,052 ("the '052 patent"). These two patents (collectively "the patents-in-suit") are part of the same family of patents: the '052 patent is a continuation of the '749 patent, which, in turn, is a continuation-in-part of a prior patent, United States Patent No. 5,799,989 ("the '989 patent").

The patents-in-suit relate to a preassembled fitting for corrugated tubing. '749 patent, col.1 ll.13–16; '052 patent, col.1 ll.16–19. A corrugated tube is a pliable metal hose with undulating peaks and valleys. The patents-in-suit teach a device for connecting one length of corrugated tubing to another, or for connecting one length of such tubing to the hardware of a piping

---

**1.** Section 302 of Title 35 states in pertinent part:

> Any person at any time may file a request for reexamination by the [PTO] of any claim of a patent on the basis of any prior art [which that person believes to have a bearing on the patentability of any claim of a particular patent] .... The request must set

forth the pertinency and manner of applying cited prior art to every claim for which reexamination is requested.

35 U.S.C. § 302 (2006). "A reexamination is complete upon the statutorily mandated issuance of a reexamination certificate ...." *In re Bass,* 314 F.3d 575, 577 (Fed.Cir.2002) (citing 35 U.S.C. § 307(a)).

system that conveys natural gas. (Dkt. No. 46, Ex. 7, Seering Report 6, 8.)

Plaintiff's fittings generally consist of: (1) a fitting body, *i.e.*, the primary component of the fitting; (2) a nut for engaging the body; (3) a sealing device, such as a collet[2] or split ring washer; and (4) a metal tubular insert or "locating sleeve" extending from the top of the body. *See, e.g.*, '749 patent, col.8 ll.37–48. Among other things, the locating sleeve maintains the necessary alignment between the body and the corrugated tubing.[3]

To use Plaintiff's fitting, the installer begins by snapping the corrugated tubing into the fitting. This action causes some portion of the sealing device to come to rest within a valley of the corrugated tubing. When the installer subsequently tightens the nut, the sealing device and the corrugated tubing move forward over the locating sleeve onto the fitting body. This process flares the cut end of the corrugated tubing creating a metal-to-metal seal by folding the convolutions of the tubing back against themselves.

Although fittings for corrugated tubing existed prior to Plaintiff's inventions, these devices required special sealing tools known as "flare tools" or employed less reliable sealing mechanisms such as rubber gaskets.[4] Plaintiff asserts that by simplifying the installation process, its inventions increased safety, saved money, and addressed a long-felt need of those in the field.

### B. *The Accused Device.*

In January 1998, less than one year after Plaintiff commercialized its technology in a product called the "AutoFlare" fitting, Defendant began manufacturing and selling the "FastMate" fitting. This device was an embodiment of United States Patent No. 6,036,237 ("the '237 patent" or "the Sweeney patent"), which the PTO issued to Michael Sweeney, a longtime Parker employee,[5] on March 14, 2000.

The original version of the FastMate fitting consisted of a fitting body, nut, and collet. (*See* Dkt. No. 85, Ex. 13, Geary Report 3.) Defendant promoted this product as a labor-saving, cost-effective way to connect corrugated tubing. (Dkt. No. 61, Ex. 21, Fox Dep. 60–61, Oct. 30, 2003; Dkt. No. 61, Ex. 22, Dougher Dep. 195, 205–08, Oct. 29, 2003.) However, numerous contractors who purchased the first FastMate fitting found it difficult to install (Fox Dep. 61), and many complained about "random leakage problems in the field," (Dkt. No. 60, Ex. 6, Fisher Dep. 87, Oct. 23, 2003).

In May 1998, Defendant responded to such complaints by issuing a "product alert" to its representatives charged with training customers. (Dkt. No. 61, Ex. 16, Parflex Product Alert; *see also* Dkt. No. 60, Ex. 14, Fitzpatrick Dep. 90–93, Feb. 19, 2004 (indicating this was the only "product alert" issued by Defendant's Parflex Division over a four-year period).) Apparently, this remedy proved ineffective as cus-

---

**2.** A collet is a holding device that forms a collar around the object to be held and exerts a strong clamping force on the object when it is tightened.

**3.** According to Plaintiff's expert, the locating sleeve also "ensures sufficient circularity of the cut end of the [corrugated tubing]." (Dkt. 60, Ex. 10, Seering Rebuttal Report 5 (noting that "often in the field the cut end of the [corrugated tubing] is oval or contains a

jagged edge as a result of imperfect cutting" and that the locating sleeve "compensate[s] for such defects").)

**4.** The prior art, as it pertains to the alleged invalidity of the patents-in-suit, will be discussed in detail below.

**5.** The '237 patent lists Defendant as the assignee.

tomers subsequently began returning large quantities of FastMate fittings (Dougher Dep. 76–77), and Defendant was forced to recall the product. In November 1998, Defendant released a revised Fast-Mate fitting that incorporated a locating sleeve. (Dkt. No. 61, Ex. 17, Moner Dep. 301, Oct. 8, 2004.)[6] Unlike its predecessor, this version has met with customer approval and enjoyed commercial success.

## C. Travel of the Case.

On February 11, 2002, Plaintiff filed a one-count complaint alleging that Defendant's redesigned FastMate fitting infringed the '749 patent. In an answer tendered on July 26, 2002, Defendant asserted numerous defenses[7] and brought a counterclaim pursuant to Fed.R.Civ.P. 13(a) and 20(a) seeking declaratory judgment of patent invalidity, unenforceability, and noninfringement.[8]

On September 30, 2002, Plaintiff served Defendant with interrogatories seeking information regarding the bases of its invalidity allegations. In a response dated July 11, 2003, Defendant stated that: (1) the '989 patent constituted "prior art" to various claims of the patents-in-suit that rendered these claims invalid under 35 U.S.C. §§ 102 and 103; (2) Defendant did

"not intend to assert invalidity under 35 U.S.C. § 111"; (3) certain dependent claims of the patents-in-suit were inconsistent with their parent claims, rendering them invalid under 35 U.S.C. § 112; and (4) other claims of the patents-in-suit would also be indefinite under section 112 "if the claims are not interpreted to differ from the FastMate fittings." (Dkt. No. 100, Ex. 32, Def.'s Resp. Pl.'s 1st Interrogs. # 8.) As Plaintiff later pointed out, Defendant never sought to supplement these answers.

On September 26, 2003, Plaintiff sought a Rule 30(b)(6) deposition regarding, among other things, Defendant's invalidity contentions. (Dkt. No. 70, Ex. 3, Pl.'s Notice Rule 30(b)(6) Dep. 1, 7.)[9] In response, Defendant took the position that "such contentions should be properly explored through interrogatories or expert witnesses." Accordingly, Defendant chose not to provide a witness to answer questions concerning any prior art that might invalidate the patents-in-suit. Defendant also elected not to designate a representative to discuss other facts that might make the patents-in-suit unenforceable. (Dkt. No. 70, Ex. 4, Oct. 10, 2003 Pezzner to Coyle Letter 3.)

---

6. As Defendant points out, the revised FastMate fitting also incorporated: a collet with additional slots and a nongalling lubricant; a shorter nut; a reduction in thread length on the body; a counterbore with a high-temperature silicone seal; and a positioning tear tab. (Dkt. No. 95, Ex. 24, Fisher Dep. 165–69, Oct. 23, 2003.)

7. In its third affirmative defense, Defendant alleged that "[t]he claims of the '749 patent are invalid ... for failure to comply with ... 35 U.S.C. §§ 101, 102, 103, 111, 112, 115, 116, 132, and 305." (Dkt. No. 5, Def.'s Answer & Counterclaim 2.)

8. Plaintiff subsequently filed a two-count amended complaint alleging infringement of the '052 patent in addition to the '749 patent.

(See Dkt. No. 11, Pl.'s Am. Compl.) Once again, Defendant raised numerous affirmative defenses in its answer, including allegations that the claims of the patents-in-suit were invalid for "failure to comply with ... 35 U.S.C. §§ 101, 102, 103, 111, 112, 115, 116, 132, and 305." (Dkt. No. 19, Def.'s Answer Am. Compl. & Counterclaim 2.)

9. This provision of the Federal Rules provides that a party may depose a corporation so long as the party describes "with reasonable particularity the matters on which examination is requested." Fed.R.Civ.P. 30(b)(6). In response, a corporation must "designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf." Id.

At the close of fact discovery in the spring of 2004, the court issued a scheduling order for initial expert reports by the party bearing the burden of proof, rebuttal reports, and expert depositions. (*See* Dkt. No. 36, Further Scheduling Order.) Pursuant to that order, Defendant submitted the expected expert testimony of David Geary on June 22, 2004. (*See* Geary Report.) [10]

In his report, Geary sought to answer a single question: whether the patents-in-suit were invalid for obviousness. Significantly, Geary did not address whether the patents-in-suit might be invalid under 35 U.S.C. §§ 102, 111, or 112.[11]

Noting that the Sweeney patent "contains each element of the '749 and '052 patents except for the ... locating sleeve" (*id.* at 3), Geary concluded that the prior art would have (1) motivated a person of ordinary skill in the art to add a locating sleeve to the fitting described by Sweeney and (2) provided a reasonable expectation that making such a modification would lead to a certain degree of success. In support of this conclusion, Geary referenced a device known as the "Parker Compressed Fitting," but did not cite the '989 patent as an invalidating reference. During a subsequent deposition, Geary expounded on the significance of the Parker Compressed Fitting to his obviousness analysis (Geary Dep. 220–22), but once again made no effort to analyze the claims of the '989 patent.

On July 2, 2004, Plaintiff submitted the report of its expert, Dr. Warren Seering. In his report, Seering opined that the term "sealing device," as used in the patents-in-suit, "would be understood by one of ordinary skill in the art ... to be any suitable mechanical device ... which would participate in the creation of a tight closure." (Seering Report at 22–23.)

On July 13, 2004, Plaintiff amended its complaint for the second time adding claims for "contributory infringement and/or inducing others to infringe." In an answer and counterclaim filed on July 30, 2004, Defendant once again invoked 35 U.S.C. §§ 101, 102, 103, 112, 116, and 132, but did not assert that the patents-in-suit were invalid under 35 U.S.C. § 111. (Dkt. No. 41, Def.'s Answer 2d Am. Compl. & Counterclaim.)

At the close of discovery, the parties submitted their proposed claim terms for construction, and the court held a *Markman* hearing on December 20, 2004. Defendant took the position that repeated references within the patents-in-suit to "a locating sleeve ... extending away from said body sealing surface" or to "a locating sleeve extending beyond said body sealing surface" meant that these two components had to be in direct contact. The court disagreed. Based on the plain language of the claims and the prosecution history of the patents, it determined that neither phrase required direct contact between the locating sleeve and body sealing surface.

Defendant also argued that the term "sealing device" found in claims 16, 20, 43, and 48 of each patent did not include a collet. Once again, the court found Plaintiff's counter-arguments more compelling

10. On that same day, Defendant produced the expected expert testimony of Ronald Moner. (*See* Dkt. No. 70, Ex. 8, Moner Report.) In his report, Moner adopted the opinions expressed by Geary. (Dkt. No. 85, Ex. 12, Moner Dep. 94, Oct. 8, 2004.) During subsequent depositions, Moner focused exclusively on the question of whether the patents-in-suit were invalid for obviousness and altogether ignored the '989 patent.

11. During his subsequent deposition, Geary reiterated that he was retained simply to determine whether claims of the patents-in-suit were obvious in light of the prior art. (Dkt. No. 70, Ex. 7, Geary Dep. 41–43, Sept. 21, 2004.)

and concluded that the term "sealing device" encompassed "any suitable sealing device, including but not limited to a collet, which participates in the creation of a tight closure." ( Dkt. No. 52, Mem. Re: Claim Construction.) [12]

After indicating its intent to adopt Plaintiff's construction of the disputed terms, the court used the final portion of the *Markman* hearing to ascertain the parties' respective positions regarding the appropriate next step in the litigation. Rather than seek additional discovery, Defendant concurred with Plaintiff's suggestion that the parties be permitted to file motions for summary judgment. (Dkt. No. 54, *Markman* Hr'g 30–31.)

On January 31, 2005, Plaintiff filed one motion for summary judgment of infringement and another seeking a judicial determination that its patents are not invalid. The following day, Defendant filed its own motion for summary judgment of invalidity.

Upon reviewing the memorandum and affidavits in support of Defendant's motion, Plaintiff filed a motion to strike and/or exclude Defendant's late expert testimony and newly asserted theories of invalidity. In particular, Plaintiff argued that: (1) Defendant should be precluded from asserting a section 111 defense, (2) Defendant should not be permitted to rely upon the '989 patent to establish obviousness or anticipation, and (3) Defendant's section 112 argument should be stricken.

After a hearing, the court allowed Plaintiff's motion and instructed Defendant to "file a substitute motion for Summary Judgment, setting forth arguments . . . anchored on the record . . . as developed up to the date that discovery was closed." (Dkt. No. 81, Mem. & Order 1.) On July 1,

2005, Defendant filed its substitute motion. The parties subsequently submitted memoranda, affidavits, and exhibits in support of their respective positions, and the court heard argument on the three pending motions on September 29, 2005.

## III. *STANDARD OF REVIEW*

"Summary judgment is as appropriate in a patent case as it is in any other case." *Desper Prods., Inc. v. QSound Labs, Inc.,* 157 F.3d 1325, 1332 (Fed.Cir.1998) (citation omitted). It must be rendered when

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In ruling on a summary judgment motion, a court must consider the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *Israel Bio–Eng'g Project v. Amgen Inc.,* 401 F.3d 1299, 1302 (Fed.Cir. 2005) (citations omitted). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.,* 289 F.3d 1367, 1375 (Fed.Cir.2002) (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The materiality of a fact depends on the substantive law, and there is no genuine issue "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

---

12. In a reply brief filed December 2, 2004, Defendant suggested that if the court found that the term "sealing device" included "any mechanical device," then certain claims of the '749 patent would be invalid for written description deficiency. (Dkt. No. 50, Def.'s Reply Claim Construction Mem. 5.)

party." *Anderson,* 477 U.S. at 248, 249, 106 S.Ct. 2505.

To determine whether summary judgment is appropriate, a court must view the evidence offered "through the prism of the substantive evidentiary burden." *Enzo Biochem, Inc. v. Gen–Probe, Inc.,* 424 F.3d 1276, 1284 (Fed.Cir.2005) (quoting *Anderson,* 477 U.S. at 242, 106 S.Ct. 2505). Whereas a patentee bears the burden of proving infringement by a preponderance of the evidence, *Centricut, LLC v. Esab Group, Inc.,* 390 F.3d 1361, 1367 (Fed.Cir.2004) (citation omitted), *cert. denied,* —— U.S. ——, 126 S.Ct. 337, 163 L.Ed.2d 49 (2005), a defendant asserting invalidity must prove each fact necessary for such a finding by "clear and convincing evidence," *Robotic Vision Sys., Inc. v. View Eng'g, Inc.,* 189 F.3d 1370, 1377 (Fed.Cir.1999) (citation omitted).

In addition, 35 U.S.C. § 282 provides a statutory presumption of patent validity and permanently places the burden of establishing invalidity on the party asserting such a claim. *Lisle Corp. v. A.J. Mfg. Co.,* 398 F.3d 1306, 1316 (Fed.Cir.2005) (citation omitted).[13] According to two commentators,

> The importance of the presumption of patent validity cannot be exaggerated. It is fair to say that the presumption of validity is to patent law what the presumption of innocence is to criminal law . . . .

Donald C. Reiley III & Robert C. Highley, 4 *Pat. L. Fundamentals* § 20:10 (2d ed.2005); *see also Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed.Cir.1986) (noting the presumption of patent validity pertains "to the patent statute *as a whole* ") (emphasis in original), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987).

## IV. INFRINGEMENT

### A. 35 U.S.C. § 271(a).

Section 271(a) of Title 35 provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor infringes the patent." 35 U.S.C. § 271(a) (2006); *see also McNeil–PPC, Inc. v. L. Perrigo Co.,* 337 F.3d 1362, 1372 (Fed.Cir.2003) (citation omitted) (stating a patent provides the "right to exclude others from making, using, and selling the invention and to enforce those rights until [its patents are] held invalid [or expire]"), *cert. denied,* 540 U.S. 1107, 124 S.Ct. 1061, 157 L.Ed.2d 893 (2004). Proving direct infringement[14] requires a plaintiff to establish "that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents."

---

13. As former Chief Judge Markey once observed, "A patent is born valid. It remains valid until a challenger proves it was stillborn or had birth defects, or it is no longer viable as an enforceable right." *Roper Corp. v. Litton Sys., Inc.,* 757 F.2d 1266, 1270 (Fed.Cir. 1985)

14. In light of its direct infringement determination, the court need not address Plaintiff's alternate argument that Defendant has infringed the patents-in-suit by inducing infringement on the part of its customers. *See* 35 U.S.C. § 271(b) (2006) ("Whoever actively induces infringement of a patent shall be liable as an infringer."); *see also Cross Med. Prods.,* 424 F.3d at 1312 (requiring patentee alleging infringement by inducement to establish, "first that there has been direct infringement, and second, that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement") (internal citations omitted).

That being said, it bears noting that Defendant has offered neither opposing evidence nor argument in response to Plaintiff's allegations of infringement by inducement.

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1310 (Fed.Cir.2005) (citation omitted).[15]

To determine whether a patent has been literally infringed a court must first construe disputed claim terms, then compare the patent's claims to the accused device. *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC,* 403 F.3d 1364, 1367–68 (Fed.Cir.2005) (citing *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc)). Having previously resolved the issue of claim construction, this court must now compare the claims at issue with the features of Defendant's FastMate fitting. If a reasonable jury could not conclude that any limitation recited in these claims is absent in the accused product, Plaintiff's motion for summary judgment of infringement must be allowed. *Goldenberg v. Cytogen, Inc.,* 373 F.3d 1158, 1163–64 (Fed.Cir.2004) (citation omitted).

### B. *Analysis.*

 Defendant concedes that the FastMate fitting contains, among other things, a locating sleeve and body sealing surface. In opposing Plaintiff's motion for summary judgment on infringement, Defendant focuses on the following clause that appears in independent claims 1, 12, 16, 20, 26, 27, 43, and 48 of the '749 patent: "A locating sleeve ... extending away from the said body sealing surface."

As previously mentioned, during claim construction, Defendant maintained that this clause required the locating sleeve and body sealing surface to be in direct physical contact. However, the court determined that the subject language meant that

> the locating sleeve stretches or draws out from a point nearer to (but not necessarily in direct contact with) the

body sealing surface to a point in another direction farther away from the body sealing surface.

Defendant now contends that (1) the court's interpretation mandates a certain degree of closeness between the locating sleeve and body sealing surface, and (2) such spatial proximity is not found in the FastMate fitting. (*See* Dkt. No. 93, Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. Infringement 3–4 (calling these components "simply two of several discrete parts on the FastMate fitting that are spaced some distance apart from one another").) Thus, Defendant contends, it cannot be found, on the undisputed record, to have infringed Plaintiff's patent.

As Plaintiff points out, there are numerous problems with Defendant's argument. First, there is simply nothing in the plain language of the claim that suggests the necessity of spatial proximity. Second, in making its spatial proximity argument, Defendant fails even to suggest what the requisite proximity might be. Finally, a visual inspection of the accused device reveals a gap between these allegedly "discrete parts" that can only be described as minuscule. Thus, even if the court's construction did require "*some* proximity" between the locating sleeve and body sealing surface, Defendant's FastMate fitting would still directly infringe the '749 patent's independent claims.

Defendant also argues against infringement of the '052 patent based upon its understanding of the phrase, "a locating sleeve extending beyond said body sealing surface." This phrase is present in each of the '052 patent's independent claims. Again, it bears noting that Defendant initially took the position that this subject

**15.** Plaintiff concedes that the doctrine of equivalents is not implicated.

language required the locating sleeve and body sealing surface to be "juxtaposed to/ side by side to/in contact with each other." (Dkt. No. 43, Parties Proposed Claim Terms Definitions). The court rejected this interpretation and found that direct contact was not required.

Defendant now submits that a reasonable jury examining the FastMate fitting could conclude that its locating sleeve does not "extend beyond" the sealing surface since the two components have no close relationship to each other. This argument is equally unavailing. Again, assuming *arguendo* that an unspecified spatial proximity requirement exists, a reasonable jury would be compelled to conclude that the accused product directly infringes the independent claims of the '052 patent.

16. This inquiry requires a court to examine "the field of the inventor's endeavor" and "the particular problem" he or she was addressing when the alleged invention was conceived. *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed.Cir. 1998) (citations omitted).

17. In assessing these differences, the Federal Circuit has consistently stressed the need to consider the claimed invention "as a whole" and cautioned against "break[ing] an invention into its component parts, then [searching for] a prior art reference corresponding to each component." *Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1337 (Fed.Cir.2005) (noting how a contrary approach "would discount the value of combining various existing features or principles in a new way to achieve a new result—often the essence of invention") (citing *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1275 (Fed.Cir. 2004)).

18. In *Okajima v. Bourdeau*, 261 F.3d 1350 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1128, 122 S.Ct. 1066, 151 L.Ed.2d 969 (2002), the court explained that

the level of skill in the art is a prism or lens through which a judge, jury, or the Board views the prior art and the claimed invention. This reference point prevents these

## V. INVALIDITY

### A. 35 U.S.C. § 103(a).

Under section 103(a) of the patent statute, a patent is invalid if

differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a) (2006).

■ While the question of obviousness is one of law, its determination rests on factual inquiries regarding: "(1) the scope and content of the prior art;[16] (2) the differences between the claims and the prior art;[17] (3) the level of ordinary skill in the pertinent art;[18] and (4) secondary considerations, if any, of nonobviousness."[19] *McGinley v. Franklin Sports,*

factfinders from using their own insight or, worse yet, hindsight, to gauge obviousness. *Id.* at 1355 (citing *Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1324 (Fed.Cir.1999)).

For the sake of the pending motions, the court accepts the opinion of Defendant's expert that a person of ordinary skill in the art "would have a Bachelor of Mechanical Engineering degree and 3 to 5 years of engineering experience, such as in designing and/or using fittings or related devices, or would have the equivalent of this degree in experience." (Geary Report 8; *cf.* Seering Report 4–5 (offering Plaintiff's interpretation of the characteristics of a person of ordinary skill in the art).)

19. These "secondary considerations" have also been referred to as "objective evidence of nonobviousness." *See, e.g., Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1320 (Fed.Cir.2004). For a list of several such factors that may be taken into account, see *In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir.1998) (citing evidence of (1) "copying," (2) a "long felt but unsolved need," (3) "failure of others," (4) "commercial success," (5) "unexpected results created by the claimed invention," (6) "unexpected properties of the claimed invention," (7) "licenses showing industry respect for the invention," (8) "and skepticism of skilled artisans before the invention").

*Inc.*, 262 F.3d 1339, 1349 (Fed.Cir.2001) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Kegel Co., Inc. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1430 (Fed.Cir.1997)).

▪ Where, as here, all the elements of an invention can be found in a combination of prior art references, a court must consider two additional factors:

> (1) whether the prior art would have suggested to those of ordinary skill in the art that they should make the claimed ... device ...; and (2) whether the prior art would also have revealed that in so making ..., those of ordinary skill would have a reasonable expectation of success.

*Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed.Cir.2006) (quoting *Velander v. Garner*, 348 F.3d 1359, 1363 (Fed. Cir.2003)), *reh'g and reh'g en banc denied* (Mar 15, 2006).

▪ The first factor in this ancillary obviousness analysis "serves to prevent hindsight bias." *Id.* (citations omitted); *see also In re Sang Su Lee*, 277 F.3d 1338, 1343 (Fed.Cir.2002)("[T]he best defense against the subtle but powerful attraction of a hindsight-based obviousness analysis is rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references.") (citation omitted). However, because "[a]n explicit teaching that identifies and selects elements from different sources and states that they should be combined in the same way as in the invention at issue, is rarely found in the prior art," the suggestion to combine references need not be stated explicitly. *In re Johnston*, 435 F.3d 1381, 1385 (Fed.Cir.2006). Rather, it may be re-

vealed by reference to: "the prior art itself," "the nature of the problem solved by the claimed invention," or "the knowledge of one of ordinary skill in the art." *Id.* (citing *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1221–22 (Fed.Cir.2003)).

As set forth above, the second subsidiary factor focuses on whether "a skilled artisan would have perceived a reasonable expectation of success in making the invention via that combination." *Medichem*, 437 F.3d at 1165. "While absolute certainty is not necessary to establish a reasonable expectation of success, there can be little better evidence negating an expectation of success than actual reports of failure." *Boehringer Ingelheim Vetmedica, Inc. v. Schering–Plough Corp.*, 320 F.3d 1339, 1354 (Fed.Cir.2003) (internal citations omitted).

### 1. *The Prior Art.*

In moving for summary judgment based upon obviousness, Defendant relies upon three pieces of prior art indisputably anchored on the record.[20] The first is the Sweeney '237 patent. As Defendant points out, Plaintiff concedes that the Sweeney patent is directed to a very similar invention as the patents-in-suit: a fitting for use with corrugated tubing that employs a collet to effectuate leak-tight, metal-to-metal seals. Indeed, Plaintiff admits that the Sweeney patent contains each element found in the claims of the patents-in-suit except for the locating sleeve.

The second relevant piece of prior art is the Parker Compression Fitting. This product was developed by Defendant prior

---

**20.** Defendant also argues that it would have been obvious to a person of ordinary skill in the art to combine certain disclosures of the '989 patent with the Sweeney patent and/or the Sweeney patent and the Sasa patent to arrive at certain claimed subject matter. As will be discussed in detail below, these arguments were not properly developed during discovery and thus are subject to the court's June 1, 2005 order allowing Plaintiff's motion to strike.

to 1995 for use with metal or nylon plastic tubing. (Dkt. No. 85, Ex. 9, Moner Dep. 52–55, Oct. 15, 2003.) It consists of a body, nut, and compression sleeve and includes an optional "tube support," or locating sleeve, for use when alignment may present a challenge. (*Id.;* Geary Report 6.)

Finally, there is Patent No. 5,292,156, which the PTO issued to Takeya Sasa and Yoshikazu Kobayashi on March 8, 1994 ("the Sasa '156 patent" or "the Sasa patent"). This patent describes a fitting for corrugated tubing that includes a stop for setting the position of the fitting relative to the nut before installing the fitting on the corrugated tubing.

### 2. *Analysis.*

█ Because all the elements of Plaintiff's invention can be found in a combination of prior art noted above, the first issue is whether that art would have motivated an artisan of ordinary skill to modify the fitting described in the Sweeney patent by adding a locating sleeve.

In support of its contention that the nature of the problem suggests just such a modification, Defendant draws attention to the Sweeney patent's repeated references to the collet's "coaxial" reception over the distal end of the corrugated tubing. These references, Defendant submits, make it clear to a person of ordinary skill that the axis of the tubing and the collet must be aligned. Thus, in instances where alignment might present a challenge, a person of ordinary skill would have been motivated to add a locating sleeve to the Sweeney fitting.

The problem with this argument is the absence of anything in Sweeney that suggests achieving proper alignment might prove problematic. As Defendant's own expert points out, the Sweeney patent does not indicate the necessity of "some additional degree of axial alignment" (Dkt. No. 60, Ex. 5, Geary Dep. 104, Sept. 21, 2004); nor does it teach "using a locating sleeve" (*id.* at 95–96). Consequently, one must ask why a skilled artisan would have sought to improve the alignment capabilities of an invention that purported to effectuate a leak-tight seal.

Defendant attempts to avoid this question by asserting that the motivation to add a locating sleeve to Sweeney's fitting arises not from any statement in Sweeney but from "the actual use of the optional locating sleeve of the Parker Compression Fitting." (Dkt. No. 99, Def.'s Reply Mem. Supp. Substitute Mot. Summ. J. 2.) Of course, since this optional locating sleeve "is available for situations where alignment may be perceived as a potential problem" (*id.*), it stands to reason that a skilled artisan would not have been motivated to add this component to an invention that refused to recognize the possibility of an alignment problem.

Assuming *arguendo* that the Parker Compression Fitting would have suggested to those of ordinary skill that they should make Plaintiff's claimed device, it is clear that the Parker Compression Fitting did not also reveal that in so making the skilled artisan would have perceived a reasonable expectation of success. This becomes evident when one considers the fact that persons of ordinary skill at Parker actually considered using a locating sleeve in the original FastMate fitting but dismissed the idea "because of cost and because of the flow restriction that a tube support brought." (Dkt. No. 61, Ex. 34, Greco Dep. 71, Feb. 13, 2004.) In other words, Defendant's own skilled artisans reasonably believed that adding the optional locating sleeve found in the Parker Compression Fitting to Sweeney would result in failure.

Such skepticism of skilled artisans before the invention is one of several secondary considerations that also undercut

Defendant's obviousness argument. Similarly debilitating is the fact that, after the original FastMate fitting leaked at unacceptable rates, Defendant released a redesigned version that incorporated the locating sleeve found on the AutoFlare—the commercial embodiment of Plaintiff's invention that had been on the market for over two years.

Finally, Defendant's case for obviousness must contend with convincing evidence that Plaintiff's invention satisfied a long-felt but unsolved need. In a letter dated December 19, 1996, Arthur Weirauch, an independent distributor of flexible metal hose systems, informed Plaintiff's president that the AutoFlare fitting was "by far the most user friendly system yet developed." (Dkt. No. 59, Weirauch Decl., Ex. A.) Indeed, according to Weirauch, "[a] metal to metal gas seal without the use of special tools is what has been need since the very beginning." (*Id.*)

In an effort to undermine the import of this correspondence, Defendant characterizes the letter as a "blatant sales pitch to become [Plaintiff's] distributor in the Rocky Mountain and Midwest region." (Dkt. No. 94, Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. 9.) Of course, even if this was the author's primary motive, the most logical reason for making such a pitch would be the sincere conviction that Plaintiff's product satisfied a long-felt but previously unsolved need.

In short, Defendant cannot prove by clear and convincing evidence that it would have been obvious to add the locating sleeve found in the Parker Compression Fitting (or any other prior art) to the fitting described by the Sweeney patent. Consequently, the court need not discuss Defendant's argument that it would have

been obvious to add, in addition, the stop described in the Sasa patent.

### B. *Fed.R.Civ.P. 37(c)(1).*

In support of its substitute motion for summary judgment, Defendant also makes invalidity arguments under 35 U.S.C. §§ 102(e), 112, 102(b), and 111. According to Plaintiff, these arguments are not anchored on the record. Thus, in order to prevent an end-run around the court's order allowing Plaintiff's motion to strike, Plaintiff requests that the court exercise its discretion to preclude Defendant from: (1) relying on the '989 patent to establish obviousness, and (2) asserting section 102, 111, or 112 defenses.

The Federal Rules of Civil Procedure require that a party's disclosure of an expert witness "be accompanied by a written report prepared and signed by the witness," setting forth "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed.R.Civ.P. 26(a)(2)(B). Once a party submits an expert report, it has an obligation to keep the information it conveys complete and accurate. Fed.R.Civ.P. 26(e)(1); *see also* Fed.R.Civ.P. 26(e)(2) (noting the duty "to amend a prior response to an interrogatory . . . if the party learns that the response is in some material respect incomplete or incorrect"). Absent "substantial justification," a party that fails to abide by the dictates of Rule 26(e) "is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any . . . information not so disclosed." Fed.R.Civ.P. 37(c)(1).

■ As the First Circuit recently reiterated,[21] in deciding whether to exclude evidence under Rule 37(c)(1) a trial court must

---

**21.** Because evidentiary rulings fail to raise issues unique to patent law, the Federal Circuit has held that the law of the appropriate regional circuit applies. *Chimie v. PPG In-*

*dus., Inc.,* 402 F.3d 1371, 1376–77 (Fed.Cir. 2005) (citation omitted). Accordingly, the court will rely on First Circuit precedent in this portion of its memorandum.

consider a multiplicity of pertinent factors, including the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects. Surprise and prejudice are important integers in this calculation. So too is an assessment of what the late disclosure portends for the court's docket.

*Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 197–98 (1st Cir.2006) (quoting *Macaulay v. Anas*, 321 F.3d 45, 51 (1st Cir.2003)); *see also id.* at 191 (noting that the issue of expert preclusion "falls in the heartland of [a trial court's] case management decisions" and is thus entitled to substantial deference). More often than not, "mandatory preclusion [is] the required sanction." *Primus v. United States*, 389 F.3d 231, 234 (1st Cir.2004) (internal quotation marks and citation omitted).

### 1. *The '989 Patent.*

■ Defendant uses the '989 patent to make several invalidity arguments in its substitute motion for summary judgment. The court will consider two of these arguments now and a third in the following section.

Defendant's first '989 argument asserts that claims 1, 2, 5, 8, 10, 12–15, 18, 22, 27–35, 45, and 50 of the patents-in-suit are invalid as obvious over the '989 patent in combination with the Sweeney patent. In support of this contention, Defendant notes that the only difference between the '989 patent and the patents-in-suit is that while the '989 patent employs a split ring washer the patents-in-suit teach the use of a collet. Since the Sweeney patent illustrates the advantages of substituting a collet for split ring washers, Defendant contends that it would have been obvious to make such a modification to the '989 patent.

Defendant next submits that claims 16, 20, 24, 25, 36–43, 47, 48, and 52–54 of the patents-in-suit, as well as claims 46 and 51 of the '052 patent, are invalid under 35 U.S.C. § 102(e)(2) as anticipated by the split ring washer version of the fitting disclosed by the '989 patent. *See Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375 (Fed.Cir.2005) ("A single prior art reference that discloses, either expressly or inherently, each limitation of a claim invalidates that claim by anticipation."). According to Defendant, because the split ring washer disclosed by the '989 patent is encompassed within each claim of the patents-in-suit that generically recites a "sealing device," these claims are anticipated by the '989 patent.

In opposing Plaintiff's motion to strike, Defendant admitted that its experts neglected to address these or any other grounds of invalidity involving the '989 patent. Citing factors deemed pertinent by the *Macaulay* court, Defendant argued that the circumstances of the case did not warrant disallowing Defendant's use of the '989 patent.

Ultimately, Defendant's arguments proved unpersuasive. In allowing Plaintiff's motion to strike, the court concluded that permitting Defendant to introduce new theories of invalidity on the day summary judgment motions were due "would have placed an untenable burden on [Plaintiff] and, in the bargain, would have contravened the spirit of the discovery rules." *Macaulay*, 321 F.3d at 52–53 (citing *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)).

Now, in light the court's June 1, 2005 order, Defendant contends that the '989 patent was in fact a part of the record at the time discovery closed. In support of this proposition, Defendant points to interrogatory answers it provided that identi-

fied the '989 patent as prior art rendering claims of the patents-in-suit invalid under sections 102 and 103. In addition, Defendant highlights the '989 invalidity analysis furnished by Attorney John Molnar, Defendant's in-house counsel, in an opinion letter [22] and during a subsequent deposition. In short, Defendant argues, Plaintiff was well aware of Defendant's intent to assert invalidity based on the '989 patent and could easily anticipate the arguments it would muster.

This reasoning finds little support in First Circuit case law. Indeed, in *Macaulay*, when the appellant argued that "the defense could not credibly claim to have been surprised" by her last-minute effort to inject a theory of liability "covered by the boilerplate language in the original complaint," the court observed that

> [i]t is one thing to tick off a laundry list of potential theories at the start of litigation. It is quite another to develop the theories that actually will be prosecuted and keep them in play.

*Id.* at 52 (citing *Torres–Rios v. LPS Labs., Inc.*, 152 F.3d 11, 16 (1st Cir.1998)).

Turning to this case, it is hard to see how Defendant's identification of the '989 patent as prior art in two interrogatory answers differs from the *Macaulay* appellant's use of boilerplate language in her original complaint. In both instances, the litigants perfunctorily raised theories at the outset of the litigation that they subsequently failed to "keep in play" by developing them through discovery.

While Defendant's in-house counsel did cover ground neglected by its experts, Attorney Molnar's opinions hardly put Plaintiff on notice that Defendant would be asserting invalidity defenses based on the '989 patent. As previously noted, when Plaintiff sought a Rule 30(b)(6) deposition concerning Defendant's invalidity contentions, Defendant directed Plaintiff to its expert witnesses. Having chosen not to designate Molnar as one such witness, Defendant cannot rely on his invalidity theories.[23]

This determination represents neither a triumph of "mere form" nor "too rigid an adherence to technical rules of practice." *Hardin v. Boyd*, 113 U.S. 756, 761, 5 S.Ct. 771, 28 L.Ed. 1141 (1885) (Harlan, J.). Because Defendant's experts reviewed Molnar's deposition transcripts prior to rendering their invalidity opinions (*see* Geary Report Ex. B, Documents Reviewed; Moner Report Ex. B, Documents Reviewed), Plaintiff reasonably regarded their decision not to cite the '989 patent as an invalidating reference as evidence that Defendant did not consider that patent in play. Having conducted no discovery on factual questions at the core of Defendant's newly asserted theories, Plaintiff would be severely prejudiced if the court now permitted Defendant to treat the '989 patent as prior art.[24]

---

**22.** (*See* Dkt. No. 100, Ex. 33, Oct. 17, 2002 Molnar Opinion Letter.) Defendant provided a copy of this letter to Plaintiff on January 6, 2004. (*See* Dkt. No. 77, Ex. 14, Jan. 6, 2004 Pezzner to Coyle Letter.)

**23.** Furthermore, as Plaintiff points out, Attorney Molnar's opinions were not provided for the purpose of establishing invalidity, but were offered instead to defend against Plaintiff's willful infringement claims.

**24.** For example, " 'the dispositive question regarding anticipation is whether *one skilled in*

*the art* would reasonably understand or infer from the [prior art reference's] teaching' that every claim element was disclosed in that single reference." *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir.2003) (citation omitted) (emphasis in original). Given that Plaintiff has not had the chance to depose persons skilled in the art concerning the inferences they would draw from the '989 patent's teaching, it would be grossly unfair to require Plaintiff to mount an anticipation defense.

In short, the court must preclude Defendant from relying upon the '989 patent as an invalidating reference at this point in the litigation.

### 2. *35 U.S.C. § 112.*

■ According to Defendant, once the court adopted Plaintiff's proposed construction of the term "sealing device," certain claims of the '749 patent became invalid under 35 U.S.C. § 112 ¶ 1. Specifically, Defendant asserts that claims 16, 19, 20, 23–25, 36–43, 47, 48, and 52–54, which recite the term "a sealing device for placement in a valley of the corrugated tubing," are invalid because these claims lack written description support in the '749 patent's specification.

Paragraph 1 of section 112 of the Patent Act provides that the specification of a patent

> must contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112 ¶ 1 (2006). The purpose of this provision is to ensure that, "as of the filing date, the inventor conveyed with reasonable clarity to those of skill in the art that he was in possession of the subject matter of the claims." *Union Oil Co. of Ca. v. Atl. Richfield Co.*, 208 F.3d 989, 997 (Fed.Cir.2000) (citation omitted), *cert. denied*, 531 U.S. 1183, 121 S.Ct. 1167, 148 L.Ed.2d 1025 (2001); *see also Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1376 (Fed.Cir.2002) ("Precisely how close the original description must come to comply with the description requirement of § 112 must be determined on a case-by-case basis." (quoting *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed.Cir. 1991))).

As Defendant points out, the term "sealing device" was not a part of the original application for the '749 patent, but was added to the disclosure by an amendment. *See TurboCare Div. of Demag Delaval Turbomach. Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1118 (Fed.Cir.2001) ("When the applicant adds a claim or otherwise amends his specification after the original filing date ... the new claims or other added material must find support in the original specification."). Because the only sealing devices found in the original '749 patent specification were a collet and pair of split ring washers, Defendant submits that an artisan of ordinary skill would not have perceived that the inventors considered any generic sealing device to be a component of the invention that they sought to describe and claim. Indeed, in light of the fact that the '749 specification explicitly denigrates the use of a fiber gasket, Defendant submits that the inventors made it clear that some mechanical devices would not be suitable for their invention. *Cf. Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed.Cir.1998), *cert. denied*, 534 U.S. 1035, 122 S.Ct. 580, 151 L.Ed.2d 451 (2001). Consequently, Defendant contends, the claims of the '749 patent that include a "sealing device" lack support in the written description and therefore run afoul of 35 U.S.C. § 112 ¶ 1.

During oral argument on Plaintiff's motion to strike, Defendant conceded that none of its experts raised or even mentioned section 112 in their original reports or depositions. (Dkt. No. 82, Pl.'s Mot. Strike Hr'g 18.) According to Defendant, it simply had no inkling that Plaintiff would advance a claim construction that would render certain claims of the '749 patent invalid until after the close of fact discovery when it received Dr. Seering's

Report. Noting that it warned Plaintiff, in a subsequent claim construction brief, that Plaintiff's proposed definition of "sealing device" could give rise to a written description issue, Defendant takes the position that its section 112 defense did not "mature" until the court construed "sealing device" to mean "any suitable device which participates in the creation of a tight closure."

Unfortunately for Defendant, its answers to interrogatories indicate that Defendant did suspect section 112 could come into play if, as it turned out, the court determined the term "sealing device" included a collet. (*See* Def.'s Resp. Pl.'s Interrog. # 8.) As previously discussed, Defendant never supplemented its original interrogatory answers, and when asked to provide additional information regarding its invalidity contentions it referred Plaintiff to its experts. Thus Defendant's later suggestion, through counsel as opposed to a designated expert, that Plaintiff's proffered construction of "sealing device" could implicate section 112 does not constitute the kind of support in the record necessary to sustain a theory's viability.

The idea that a written description defense did not "come into being" until the court issued its *Markman* ruling also lacks support in the record. As the interrogatory answers noted above make clear, Defendant's steadfast position has been that the term "sealing device" includes any suitable mechanical device, except for a collet. Consequently, if the court had adopted Defendant's proffered construction, Defendant would have still been in the position to argue, as it does now, that other sealing devices, such as a fiber gasket, were not initially contemplated by the inventors as being a part of their invention. In other words, Defendant was incorrect when it stated during oral argument that "the condition precedent ... to being able to make the [section 112] defense occurred when the court ruled in favor of Omegaflex [at the *Markman* hearing]." (Dkt. No. 82, Pl.'s Mot. Strike Hr'g 16.) [25]

Having determined that the history of the litigation does not favor allowing Defendant to assert a written description defense, the court must now consider other "pertinent factors" set forth in *Macaulay*.[26] Notwithstanding Plaintiff's strong opposition to Defendant's section 112 allegations on the merits, it would be next to impossible for Plaintiff to overcome the adverse effects of Defendant's late assertion of a written description deficiency.

■ Federal Circuit case law clearly views compliance with the written description requirement as a question of fact. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed.Cir.2005) (citations omitted); *see also Enzo Biochem, Inc. v. Gen–Probe Inc.*, 323 F.3d 956, 963 (Fed.Cir.2002) ("Compliance with the written description requirement is essentially a fact-based inquiry that will 'necessarily vary depending on the nature of the invention claimed.'"). Indeed, in a case such as this, among the most significant factors is "the amount of knowledge imparted to those skilled in the art by the disclosure.'" *Union Oil*, 208 F.3d at 996 (citation omitted). Because Defendant never suggested

---

25. Assuming *arguendo* that a section 112 defense did not mature until the court adopted Plaintiff's definition, it bears noting that Defendant did not, at that point, request another round of expert reports. Instead, it concurred with Plaintiff that summary judgment was the proper next step in the litigation. (*See* Dkt. No. 54, *Markman* Hr'g 30–31.)

26. Because Defendant has maintained throughout that a section 112 defense did not ripen until the court's *Markman* ruling, the court is not in a position evaluate Defendant's "need for the challenged evidence" or its "justification (if any) for the late disclosure." *Macaulay*, 321 F.3d at 51.

during fact discovery that it would be pursuing a section 112 defense, Plaintiff never asked the artisans it deposed whether the '749 patent's disclosure of a collet and split ring washer disclosed the suitability of any generic sealing device. Hence, Plaintiff simply cannot "palliate the ill effects stemming from the late disclosure." *Thibeault v. Square D Co.*, 960 F.2d 239, 246 (1st Cir.1992), *cited with approval in Macaulay*, 321 F.3d at 51.

Since permitting a section 112 invalidity defense would cause Plaintiff to suffer undue prejudice, the court has no choice but to preclude Defendant from asserting such a defense. In light of this ruling, the court need not address other invalidity theories offered after the close of discovery, which Defendant concedes are contingent upon the existence of a written description deficiency.[27]

## VI. CONCLUSION

For the reasons set forth above, the court hereby: (1) ALLOWS Plaintiff's motion for summary judgment of infringement (Dkt. No. 55), (2) ALLOWS Plaintiff's motion for summary judgment that its patents are not invalid (Dkt.No.57), and (3) DENIES Defendant's motion for partial summary judgment of invalidity (Dkt. No. 83).

---

**27.** According to Defendant, the '749 patent's failure to comply with section 112 means that certain claims of the '052 patent are only entitled to a filing date of June 21, 2000—the date Plaintiff applied for the '052 patent— rather than August 4, 1997—the date Plaintiff applied for the '749 patent. Consequently, Defendant argues, the '989 patent, which issued on September 1, 1998, is an invention patented more than one year prior to the date of the application for the '052 patent, rendering certain claims of the '052 patent invalid under 35 U.S.C. § 102(b).

The clerk will set the case for a conference to establish a schedule for a trial on the issue of damages.

It is So Ordered.

In addition, Defendant argues that if the '749 patent suffers from a written description deficiency, then the claims in the '052 patent reciting a generic "sealing device" constitute new matter not disclosed by the '749 patent; thus, the application for the '052 patent should have been filed as a "continuation-in-part" of the '749 patent rather than as a continuation. Because Plaintiff failed to abide by the statutory requirement requiring the submission of a new oath along with its "continuation-in-part" application, Defendant maintains that the '052 patent is invalid under 35 U.S.C. § 111.